# IN THE SUPREME COURT OF TEXAS

════════════
No. 13-0670
════════════

IN RE DEEPWATER HORIZON, RELATOR

═══════════════════════════════════════════
ON CERTIFIED QUESTIONS FROM THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT
═══════════════════════════════════════════

**Argued September 16, 2014**

JUSTICE GUZMAN delivered the opinion of the Court in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLETT, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE JOHNSON filed a dissenting opinion.

This is an insurance-coverage dispute arising from the April 2010 explosion and sinking of the *Deepwater Horizon* oil-drilling rig, which claimed eleven lives and resulted in subsurface discharge of oil into the Gulf of Mexico at alarming rates for nearly three consecutive months. The ensuing damage spawned a spate of state and federal litigation, but the issue presented to this Court concerns only the extent of insurance coverage afforded to the oil-field developer, BP,[1] as an additional insured under primary- and excess-insurance policies procured by the drilling-rig owner, Transocean.[2] At issue is the interplay between the subject insurance policies and provisions in a

---

[1] "BP" refers to BP America Production Company; BP Exploration & Production Inc.; BP Corporation North America Inc.; BP Company North America Inc.; BP Products North America Inc.; BP America Inc.; BP Holdings North America Limited; and BP p.l.c.

[2] "Transocean" refers to Transocean Offshore Deepwater Drilling, Inc.; Transocean Holdings, L.L.C.; Transocean Deepwater Incorporated; and Triton Asset Leasing GmbH.

drilling contract giving rise to Transocean's obligation to name BP as an additional insured.

Regarding that matter, the U.S. Court of Appeals for the Fifth Circuit has certified the following two

questions:

> 1. Whether *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008), compels a finding that BP is covered for the damages at issue, because the language of the umbrella policies alone determines the extent of BP's coverage as an additional insured if, and so long as, the additional insured and indemnity provisions of the Drilling Contract are "separate and independent"?
>
> 2. Whether the doctrine of *contra proferentem* applies to the interpretation of the insurance coverage provision of the Drilling Contract under the ATOFINA case, 256 S.W.3d at 668, given the facts of this case?[3]

*In re Deepwater Horizon*, 728 F.3d 491, 500 (5th Cir. 2013).

As to the first question, we hold that (1) the Transocean insurance policies include language

that necessitates consulting the drilling contract to determine BP's status as an "additional insured";

(2) under the terms of the drilling contract, BP's status as an additional insured is inextricably

intertwined with limitations on the extent of coverage to be afforded under the Transocean policies;

(3) the only reasonable construction of the drilling contract's additional-insured provision is that

BP's status as an additional insured is limited to the liabilities Transocean assumed in the drilling

contract; and (4) BP is not entitled to coverage under the Transocean insurance policies for damages

arising from subsurface pollution because BP, not Transocean, assumed liability for such claims.

We therefore answer the first certified question in the negative, and based on our analysis of that

issue, do not reach the second question.

---

[3] The doctrine of *contra proferentem*, also known as the ambiguity rule, requires that courts favor an insured's interpretation of an insurance policy if there is more than one reasonable interpretation. *ATOFINA*, 256 S.W.3d at 668; *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex. 1976).

## I. Background

At the time of the events giving rise to the underlying litigation, Transocean owned the *Deepwater Horizon*, a mobile offshore drilling unit operating in the Gulf of Mexico pursuant to a drilling contract between Transocean's predecessor and BP's predecessor (the Drilling Contract).[4] After an explosion, the rig caught fire and fully submersed after burning for more than a day. The incident killed eleven crew members, propagated numerous personal-injury claims, and begat a myriad of claims for environmental and economic damages stemming from the discharge of millions of gallons of oil into the Gulf of Mexico.

Both BP and Transocean sought coverage under Transocean's primary- and excess-insurance policies for claims related to this catastrophic event. Although not disputing that BP is an additional insured under the Transocean policies, Transocean and its insurers dispute that BP is entitled to coverage for liabilities it expressly assumed in the Drilling Contract. Based on the parties' respective assumptions of liability in the Drilling Contract, Transocean and its insurers contend that BP is not entitled to additional-insured coverage for pollution-related liabilities arising from subsurface oil releases in connection with the *Deepwater Horizon* incident.

In the Drilling Contract, BP and Transocean agreed to a "knock-for-knock" allocation of risk that is standard in the oil and gas industry.[5] Among other indemnity provisions, Transocean agreed

---

[4] The Drilling Contract was executed on December 9, 1998, between Vastar Resources Inc. (BP's predecessor) and R&B Falcon Drilling Co. (Transocean's predecessor).

[5] *See* Cary A. Moomjian, Jr., *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry*, Drilling Contractor, Mar.–Apr. 1999, at 14 (observing that offshore operators typically agree to accept responsibility for losses from a blowout that include control of the well, damage to the hole, pollution cleanup and removal, pollution damage to third parties, and reservoir loss or damage); Daniel B. Shilliday, et al., *Contractual Risk-Shifting in Offshore Energy Operations*, 81 Tul. L. Rev. 1579, 1599 (2007) (defining "knock-for-knock" indemnity agreements as agreements that "require each party to contractually assume responsibility for injuries to its own employees and damage to its own property, without regard to who caused the injury or how such damage occurred").

to indemnify BP for above-surface pollution regardless of fault,[6] and BP agreed to indemnify

Transocean for all pollution risk Transocean did not assume, *i.e.*, subsurface pollution.[7]

Without limiting Transocean's indemnity obligations, the Drilling Contract further required

Transocean to carry multiple types of insurance at its own expense.[8]  Among the required policies,

Transocean was obliged to carry comprehensive general liability insurance, including contractual

liability insurance for the indemnity agreement, of at least $10 million.  Transocean was also charged

with naming BP, its affiliates, officers, employees, and a host of other related individuals and

entities:

> as additional insureds in each of [Transocean's] policies, except Workers'
> Compensation *for liabilities assumed by [Transocean] under the terms of [the
> Drilling] Contract*.  (Emphasis added.)

---

[6] Article 24.1 of the Drilling Contract provides:

[Transocean] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold
[BP] and its joint owners harmless from and against any . . . liability for pollution or contamination,
including control and removal thereof, originating on or above the surface of the land or water, from
spills, leaks, or discharges . . . without regard to negligence of any party or parties and specifically
without regard to whether the spill, leak, or discharge is caused in whole or in part by the negligence
or other fault of [BP].

(Capitalization and boldfacing removed.)

[7] Section 24.2 of the Drilling Contract states:

[BP] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold
[Transocean] harmless from and against any . . . liability for pollution or contamination, including
control and removal thereof, arising out of or connected with operations under this contract hereunder
and not assumed by [Transocean] in Article 24.1 above, without regard for negligence of any party
or parties and specifically without regard for whether the pollution or contamination is caused in whole
or in part by the negligence or fault of [Transocean].

(Capitalization and boldfacing removed.)

[8] As is typical for a supermajor oil company, BP has been self-insuring its risk since 1991, because maintaining
third-party insurance for an operation of its magnitude would be cost prohibitive.  "Supermajor" is the industry term for
the five largest publicly traded oil companies:  ExxonMobil, Shell, BP, Total (from France), and Chevron.  Tom Bergin,
*Oil Majors' Output Growth Hinges on Strategy Shift*, REUTERS, Aug. 1, 2008, *available at*
http://www.reuters.com/article/2008/08/01/us-oilmajors-production-idUSL169721220080801.

To the extent the terms of the Drilling Contract are incorporated into Transocean's insurance policies, the proper construction of the emphasized portion of the foregoing additional-insured provision becomes central to the resolution of the coverage issue before us. Before reaching that issue, however, we must first consider the insurance-policy terms under which BP claims additional-insured status.

To cover Transocean's worldwide drilling operations, including its obligations under the Drilling Contract with BP, Transocean maintained (1) a $50 million general-liability policy with Ranger Insurance, Ltd. as its primary policy and (2) four layers of excess insurance from a multitude of additional insurers with an additional $700 million in coverage (Ranger and the excess insurers, collectively, are referred to herein as "the Insurers").

Under the operative provisions of the insurance policies, each insurer is obligated to pay for a loss "on behalf of the 'Insured'" for liability:

(a)     imposed upon the "Insured" by law or

(b)     assumed by the "Insured" under an "Insured Contract."[9]

As the named insured, Transocean is an "Insured" under the policies. BP is not specifically named as an insured in the policies, an endorsement, or a certificate of coverage. However, the policies extend "Insured" status to "[a]ny person or entity to whom the 'Insured' is obliged by oral or written 'Insured Contract' . . . to provide insurance such as afforded by [the] Policy." An "Insured Contract" is defined as "any written or oral contract or agreement entered into by the 'Insured' . . . and pertaining to business under which the 'Insured' assumes the tort liability of another party to pay for

---

[9] The parties agree that the terms of the primary- and excess-insurance policies are materially identical and are governed by Texas law.

'Bodily Injury' [or] 'Property Damage' . . . to a 'Third Party' or organization."[10] Thus, under the express terms of the policies, additional-insured status hinges on (1) the existence of an oral or written contract, (2) pertaining to the business of an "Insured", and (3) under which an "Insured" assumes the tort-liability of another party and is "obliged" to provide insurance to such other party. The policy further specifies that "where required by written contract, bid or work order, additional insureds are automatically included hereunder . . . ."

After BP made a demand for coverage, the Insurers sought a declaration that BP would not be entitled to additional-insured coverage for subsurface-pollution claims arising from the *Deepwater Horizon* incident because the Drilling Contract limits the additional-insured obligation to *"*liabilities assumed by [Transocean] under the terms of [the Drilling] Contract." With its interests in a finite sum of insurance imperiled by BP's coverage claim, Transocean intervened in the litigation and aligned itself with the Insurers.

There is no dispute that (1) BP is an additional insured under the Transocean policies for some purposes, (2) the Drilling Contract is an Insured Contract as defined by the insurance policies, and (3) the Insurers are not parties to the Drilling Contract. The parties, however, join issue regarding whether and to what extent the policies incorporate provisions in the Drilling Contract that may limit BP's status as an additional insured. The federal district court resolved that issue adversely to BP and, considering the insurance policies in connection with the terms of the Drilling Contract, determined that BP is not an "Insured" for subsurface pollution liabilities deriving from the *Deepwater Horizon* incident. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf*

---

[10] "Tort liability" is defined as "a liability that would be imposed by law in the absence of any contract or agreement."

6

*of Mexico, on April 20, 2010*, MDL No. 2179, 2011 WL 5547259, at *2 (E.D. La. Nov. 15, 2011).

The court therefore granted summary judgment in the Insurers' favor. *Id.*

On appeal, the Fifth Circuit reversed, holding that *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008), along with its state and federal progeny, requires that the coverage dispute be ascertained solely from the four corners of the insurance policies. 710 F.3d 338, 344-49 (5th Cir. 2013), *withdrawn by* 728 F.3d 491, 493 (5th Cir. 2013). Applying that principle, the court concluded that the Transocean insurance policies "impose[] no relevant limitations upon the extent to which BP is covered." *Id.* at 341; *see id.* at 350. On rehearing, however, the Fifth Circuit withdrew its prior opinion and certified the above questions to this Court. 728 F.3d 491, 493, 500 (5th Cir. 2013).

## II. Discussion

The key points of contention among the parties are (1) whether the language employed in the insurance policies refers to, and thus incorporates, coverage limitations in the Drilling Contract from which BP's additional-insured status derives; (2) whether the Drilling Contract actually imposes any limitation on the extent of additional-insured coverage under the primary- and excess-insurance policies; and (3) who gets the benefit of the doubt if there is any ambiguity.

BP argues that *ATOFINA* requires the existence and extent of coverage to be ascertained exclusively from the four corners of the Transocean insurance policies. 256 S.W.3d 660 (Tex. 2008). Although acknowledging that we must give effect to language in an insurance policy incorporating the terms of another contract by reference, BP contends that no such circumstances are presented here. In BP's view, the language in the Transocean insurance policies is materially indistinct from policy language we and other courts have found to be insufficient to import external

7

limitations into an insurance policy. In addition to *ATOFINA*, BP relies on *Aubris Resources LP v. St. Paul Fire & Marine Insurance Co.*, 566 F.3d 483 (5th Cir. 2009), and *Pasadena Refining System, Inc. v. McRaven*, Nos. 14-10-00837-CV, 14-10-00860-CV, 2012 WL 1693697 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd by agr.), as supporting a construction of the insurance policies that does not permit consideration of the Drilling Contract. In sum, BP contends that its worldwide operations are automatically covered for all "liability imposed by law," including subsurface pollution from the *Deepwater Horizon* incident, because it is undisputed that (1) the Drilling Contract is an "Insured Contract," (2) the Drilling Contract obligates Transocean to provide additional-insured coverage, (3) BP is thereby an "Insured" as that term is specially defined in the insurance policies, and (4) no limitations on the scope of coverage are expressly included in the policies.[11]

In Transocean and the Insurers' view, BP's analysis glosses over the inconvenient reality that BP is an "Insured" only by virtue of the status conferred to it under the Drilling Contract, to which the policies necessarily refer by predicating additional-insured status on the existence of an oral or written "Insured Contract" requiring such coverage. They rely on *Urrutia v. Decker*, 992 S.W.2d 440 (Tex. 1999), for the proposition that "Texas law has long provided that a separate contract can be incorporated into an insurance policy by an explicit reference clearly indicating the parties' intention to include that contract as part of their agreement." *Id.* at 442. Applying this exception to

---

[11] Because the policies also extend coverage to an "Insured" for liability "assumed by the 'Insured'" under an 'Insured Contract,'" BP's construction of the policy would result in the extension of additional-insured coverage to a potentially unlimited number of "other person[s] or entit[ies] to whom [BP as an] 'Insured' is obliged by any oral or written 'Insured Contract' . . . to provide insurance . . . ." Under BP's interpretation, those other persons or entities would also meet the definition of an "Insured," with the potential for an endless chain of "Insureds" created by contracts that each in turn has with someone else. The validity of a construction of the policy that would permit such a scenario is facially suspect.

8

*Evanston*'s four-corners analysis, they contend that the Drilling Contract is incorporated into the Transocean insurance policies by virtue of policy language limiting additional-insured status to "where required" and as "obliged" by an oral or written contract. Because BP's status as an "Insured" cannot be ascertained without consulting the additional-insured provision in the Drilling Contract, Transocean and the Insurers further assert that we must give decisive weight to language in that provision limiting the scope of additional-insured coverage to "liabilities assumed by [Transocean] under the terms of [the Drilling] Contract." Under their contract-construction theory, the Drilling Contract requires Transocean to name BP as an additional insured only for the above-surface pollution risk that Transocean assumed and, as a result, BP lacks additional-insured status for subsurface pollution risks.

## A. Applicable Policy-Construction Principles

Determining whether BP's additional-insured coverage is coextensive with Transocean's coverage necessarily begins with the four corners of the policies. *See ATOFINA*, 256 S.W.3d at 664. As the parties acknowledge, Transocean's insurance policies contain no language explicitly limiting the scope of additional-insured coverage.

However, we have long held insurance policies can incorporate limitations on coverage encompassed in extrinsic documents by reference to those documents. *See id.* at 667 (addressing a "following form" excess-insurance policy that restricted coverage by reference to scope of underlying liability policy); *Urrutia*, 992 S.W.2d at 441, 443 (rental agreement was effectively "written into" insurance policy by virtue of endorsement language extending additional-insured status to insured's customers "to the extent and for the limits of liability agreed to under [the rental agreement]"). We do not require "magic" words to incorporate a restriction from another contract

9

into an insurance policy; rather, it is enough that the policy clearly manifests an intent to include the contract as part of the policy. *See Urrutia*, 992 S.W.2d at 442-43 (finding insurance policy's reference to rental agreement "explicit" enough to clearly indicate parties' intent to include agreement as part of insurance policy); *see also Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968) (for purposes of incorporation by reference "[t]he language used is not important provided the [contract] plainly refers to another writing").

Thus, while our inquiry must begin with the language in an insurance policy, it does not necessarily end there. In other words, we determine the scope of coverage from the language employed in the insurance policy, and if the policy directs us elsewhere, we will refer to an incorporated document to the extent required by the policy. Unless obligated to do so by the terms of the policy, however, we do not consider coverage limitations in underlying transactional documents. Our application of these foundational principles in *Urrutia* and *ATOFINA* guides our analysis of the policies and Drilling Contract at issue here.

In *Urrutia*, we construed an insurance policy that referred to another document to identify who was an additional insured and the extent of coverage under the policy. 992 S.W.2d at 441 & n.1. The issue was whether a vehicle rental agreement was effective to limit an additional insured's liability insurance to $20,000 instead of the $1 million policy limits available under the leasing company's commercial-business automobile policy. *Id.* at 441. The policy covered "[b]oth lessees and rentees of covered autos as insureds, but only to the extent and for the limits of liability agreed to under contractual agreement with the named insured." *Id.*

Given the language in the policy, a customer's status as an additional insured depended on the existence of a rental agreement, and coverage was expressly limited to the amount specified in

10

such agreement. *See id*. at 443. We therefore held that the insurance policy incorporated the rental agreement and that the rental agreement, in turn, limited the customer's liability protection to $20,000. *Id*. at 443-44 ("An insurer may validly agree to add as an additional insured 'any person or organization to which the named insured is obligated by virtue of a written contract to provide insurance.' Such an endorsement also 'may provide lower coverage limits to the additional insured than to the named insured.'" (quoting 21 DORSANEO, TEXAS LITIGATION GUIDE § 341.07[2][h] at 341–57-58) (July 1998))).

As *Urrutia* demonstrates, an insurance policy may incorporate an external limit on additional-insured coverage. In such cases, the external limit is, in effect, an endorsement to the insurance policy that "suppl[ies] the limits of coverage and extend[s] those benefits to the customer identified therein as accepting the [insured's] offer of insurance." *Id.* at 443. By tying additional-insured coverage to the terms of an underlying agreement, the parties procure only the coverage the insured is contractually obligated to provide, thereby minimizing the insurer's exposure under the policy and the named insured's premiums. *See id*. ("The endorsement . . . allowed [the insured] to determine in the rental contracts themselves which customers would be insured and the amount of their respective coverage.").

*ATOFINA*, on the other hand, recognizes that a named insured may gratuitously choose to secure more coverage for an additional insured than it is contractually required to provide. This occurs when the language of an insurance policy does not link coverage to the terms of an agreement to provide additional-insured coverage. In that event, only coverage restrictions embodied in the policy will be given effect. As discussed below, *ATOFINA* involved one coverage provision that was tied to the terms of another agreement and one coverage provision that was limited only by the

11

terms of the policy itself.

In *ATOFINA*, Triple S Industrial Corp. contracted to perform maintenance and construction work at an ATOFINA refinery under a service contract that contained separate indemnity and insurance provisions. 256 S.W.3d at 662. Triple S agreed to indemnify ATOFINA for personal-injury and property loss that was not due to ATOFINA's concurrent or sole negligence, misconduct, or strict liability. *Id*. Triple S also agreed to carry $500,000 of commercial general liability (CGL) insurance, "'[i]ncluding coverage for contractual liability insuring the indemnity agreement,'" and $500,000 in excess insurance that followed the form of the CGL policy. *Id.* at 662-63. Triple S was also obligated to furnish certificates of insurance naming ATOFINA as an additional insured. *Id*. at 663. Triple S complied with its service-contract obligations by securing a $1 million CGL policy and a $9 million excess policy and furnishing the required certificates. *Id*. When a Triple S employee drowned at the refinery, his survivors sued Triple S and ATOFINA. *Id*. Triple S's CGL insurer tendered its $1 million limit to settle the suit, but the excess insurer denied ATOFINA coverage. *Id*.

In determining the existence and extent of coverage, we considered two independent coverage provisions in the excess-insurance policy. *Id*. The first provision (section III.B.6) extended coverage to "[a] person or organization for whom [the insured has] agreed to provide insurance as is afforded by this policy; but that person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you." *Id*. at 664. The insurer asserted that the accident did not respect Triple S's operations because ATOFINA's sole negligence caused the accident. *Id*. We disagreed. In doing so, we distinguished between Triple S's indemnity obligation under the contract and the insurer's indemnity obligation under the terms

12

of the excess policy because the insurer's obligation depended on what it contracted to do, not what the insured contracted with another person to do.

Although the underlying service contract did not require Triple S to indemnify ATOFINA for ATOFINA's negligence, we concluded that the insurance policy neither included nor incorporated a similar limitation. *Id*. at 663, 666-67. Rather, the only restriction on the scope of additional-insured coverage under section III.B.6 was the requirement that the claims involve Triple S's operations or facilities. *Id*. Because the accident was related to Triple S's operations, the claim for which ATOFINA sought coverage was within the scope of the coverage afforded under section III.B.6 of the policy without regard to ATOFINA's culpability. *Id*.

The existence of a certificate of insurance naming ATOFINA as an additional insured meant that, unlike *Urrutia* and the present case, there was no need to look to the underlying service contract to ascertain ATOFINA's status as "[a] person or organization for whom you have agreed to provide insurance as is afforded by this policy." *See id*. at 663. Here, at a minimum, the Transocean insurance policies require reference to the underlying Drilling Contract to determine BP's status as an additional insured. Moreover, section III.B.6 of the policy in *ATOFINA* made no reference to the service contract in determining the scope of additional-insured coverage, while the Transocean policies refer to an "Insured Contract" that requires Transocean to provide the insurance as a predicate to status as an "Insured."

The significance of these distinctions is supported by our analysis of a second insurance provision at issue in *ATOFINA*. That provision (section III.B.5) defined an insured as "[a]ny other person or organization who is insured under a policy of 'underlying insurance'" but stated that "[t]he coverage afforded such insureds under this policy will be no broader than the 'underlying insurance'

13

except for this policy's Limit of Insurance." *Id*. at 667. We concluded that III.B.5 encompassed a narrower extension of coverage because it expressly incorporated limits on coverage by reference to the underlying CGL policy. We enforced section III.B.5 as written, and because the underlying CGL policy excluded losses caused by ATOFINA's sole negligence, we held that limitation also applied to the excess policy. *Id*. at 667 & n.24. Our analysis of this second provision affirms the principle from *Urrutia* that an insurance policy may refer to another document to determine the extent to which an additional insured is covered.

*ATOFINA* embodies several principles that are pertinent to the matter at hand. First, it is possible for a named insured to purchase a greater amount of coverage for an additional insured than an underlying service contract requires. Second, the scope of indemnity and insurance clauses in service contracts is not necessarily congruent. Third, and most importantly, we rely on the policy's language in determining the extent to which, if any, we must look to an underlying service contract to ascertain the existence and scope of additional-insured coverage.

In addition to *ATOFINA*, BP asserts that in form, two other cases impact the relevant analytical framework. The first case on which BP relies is *Aubris Resources LP v. St. Paul Fire & Marine Insurance Co.*, 566 F.3d 483 (5th Cir. 2009). In *Aubris*, an insurance policy provided that "[a]ny person . . . that you agree in a written contract for insurance to add as an additional protected person under this agreement is also a protected person . . . if that written contract for insurance specifically requires such coverages for that person . . . ." *Id.* at 487 (emphasis omitted). As directed by the insurance policy, the court turned to the additional-insured obligation in the underlying contract, which provided that the "extension of [additional-insured] coverage shall not apply with respect to any obligations for which [the owner] has *specifically* agreed to indemnify Contractor."

14

*Id*. (bolding omitted, emphasis added). Although the underlying contract included a general indemnity provision, the *Aubris* court construed the term "specifically agreed" to mean an extra-contractual agreement to provide indemnification for the specific claim against the owner. *Id*. at 489-90. Because the owner and contractor reached no extra-contractual indemnity agreement specifically related to the litigation in question, the court held that the owner was an additional insured whose coverage was not restricted by the indemnity allocation in the contract. *Id*. at 490.

BP presents *Aubris* for the proposition that when indemnity and insurance agreements in an underlying contract are separate, the contractual-indemnity provision does not limit the additional-insured obligation or the scope of coverage afforded thereunder. In actuality, *Aubris* adhered to *Urrutia* and *ATOFINA* by looking to the language of the underlying contract (to the extent the insurance policy required) to determine whether there was any limit on additional-insured coverage. *See id.* at 487 (observing that the court "consider[ed] the relationship between and among the policy, the additional insured provision in the services agreement, and the indemnity provision in the services agreement"). Having done so, it determined that there simply was no limitation in the contract that was applicable to the additional-insured's coverage demand. Here, the parties disagree about the precise construction of the additional-insured provision in the Drilling Contract, but unlike *Aubris*, whatever limitation exists is entwined with the "liabilities [Transocean] assumed . . . under the terms of this Contract."

The other case BP cites is *Pasadena Refining System, Inc. v. McRaven,* Nos. 14-10-00837-CV, 14-10-00860-CV, 2012 WL 1693697 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd by agr.). There, an additional-insured endorsement extended coverage to "[a]ny person or organization . . . for whom the named insured . . . has specifically agreed by written contract to

15

procure bodily injury . . . insurance," but restricted such coverage to "liability arising out of the work done by or on behalf of the named insured." *Id*. at *14. Pursuant to a service agreement between the contractor and the refinery premises owner, the contractor was required to add the owner as an additional insured but "only to the extent [the premises owner] is indemnified by CONTRACTOR under the terms of the contract." *Id*. In declining to apply the service agreement's indemnity limitation to the insurance policy, the court held that the policy language was unambiguous and neither contained nor incorporated a restriction on additional-insured coverage tied to the indemnity obligations in the service agreement. *Id.* at *16-17.[12] Unlike the policy language in *Pasadena*, the Transocean policies require that the additional-insured obligation arise from a contract involving an indemnity agreement and specify that additional-insured coverage is extended as "obliged" and "where required" therein.

Contrary to any suggestion otherwise, the foregoing authority cannot be interpreted as excluding from consideration restrictions on the scope of additional-insured coverage contained in a contract that has been incorporated into the terms of an insurance policy. Rather, this authority affirms the principle that we must consider the terms of an underlying contract to the extent the policy language directs us to do so. *See, e.g.*, *Urrutia*, 992 S.W.2d at 442.

---

[12] In what appears to be an alternative holding, or dicta, the court concluded that the contractual-indemnity obligation was separate and independent from the contractual obligation to extend additional-insured coverage because the service agreement did not require the contractor to obtain insurance to secure its indemnity obligation. *Id.* at *17. In comparison to the service agreement at issue in *Pasadena Refining*, the Drilling Contract links Transocean's duty to insure to its duty to indemnify by requiring Transocean to obtain "Comprehensive General Liability Insurance, including contractual liability insuring the indemnity agreement as set forth in the Contract." Thus, language the court evidently found to be lacking in *Pasadena Refining* is present here.

Somewhat relatedly, BP contends that the Insurers cannot rely on the indemnity allocation in the Drilling Contract because they are not third-party beneficiaries to it. But Transocean is a named party to the Drilling Contract and has intervened in this dispute. Moreover, BP cites no authority requiring that both parties to a contract that incorporates another document by reference be parties to the referenced document.

16

## B. Application

### 1. Incorporation by Reference

The next order of business is to determine whether the Transocean insurance policies incorporate any limitations in the Drilling Contract with respect to the extent of BP's status as an additional insured. In making this determination, we construe the policies as we would any other contract. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Our primary objective in doing so is to ascertain and give effect to the parties' intent as expressed by the words they chose to effectuate their agreement. *Id.* To that end, we give the words in the policy their ordinary and generally accepted meaning unless the policy indicates that the parties intended the language to impart a technical or different meaning. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 158 (Tex. 2003). We must examine the policy as a whole, seeking to harmonize all provisions and render none meaningless. *Gilbert*, 327 S.W.3d at 126. If an insurance contract uses unambiguous language, we will construe it as a matter of law and enforce it as written. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527-28 (Tex. 2010). Whether a contract is ambiguous is a question of law for the court to decide by looking at the policy as a whole in light of the circumstances present when the contract was entered. *Kelley–Coppedge, Inc. v. Highland Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). Disagreement about a policy's meaning does not create an ambiguity if there is only one reasonable interpretation. *Id.* With these principles in mind, we turn now to the policy language at issue.

BP is not named in any of the insurance policies nor is there any claim or evidence that it is expressly included as an additional insured in an endorsement or certificate of insurance; thus, if the coverage inquiry were constrained to the language in the insurance policy, BP would have no

17

coverage at all. But that is not the case. Instead, the policies confer coverage by reference to the Drilling Contract in which (1) Transocean assumed some liability for pollution that might otherwise be imposed on BP (making that contract an "Insured Contract") and (2) Transocean is "obliged" to procure insurance coverage for BP as an additional insured (making BP an "Insured"). Moreover, additional insureds are automatically included under the policy only "where required by written contract, bid or work order." The language in the insurance policies providing additional-insured coverage "where required" and as "obliged" requires us to consult the Drilling Contract's additional-insured clause to determine whether the stated conditions exist.[13] As explained more fully below, when we do so, it becomes apparent that the only reasonable interpretation of that clause is that the parties did not intend for BP to be named as an additional insured for the subsurface pollution liabilities BP expressly assumed in the Drilling Contract.

## 2. Contractual Limitations on Additional-Insured Status

The additional-insured provision is contained in Exhibit C to the Drilling Contract, which obligates Transocean to acquire various types and minimum limits of insurance, including CGL, workers' compensation, and employer's liability insurance. Subsection 3 of Exhibit C states in its entirety:

> [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers, and agents shall be named as additional insureds in each of [Transocean's] policies*, except Workers' Compensation for liabilities assumed by [Transocean] under the terms of this contract.* (Emphasis added.)

---

[13] *Cf. Becker v. Tidewater, Inc.*, 586 F.3d 358, 370-72 (5th Cir. 2009) (applying maritime and Louisiana law to construe policy language defining an assured as an entity to which the named assured was "obligated by virtue of a contract or agreement to include or name as an assured" as being limited by an indemnity restriction in the underlying service contract); *Certain Underwriters at Lloyd's London v. Oryx Energy Co.*, 142 F.3d 255, 258 (5th Cir. 1998) (applying Texas law to construe policy language providing coverage for an additional insured "when required" to call for an examination of the extent of the indemnity agreement in the underlying contract).

18

It is immediately apparent from the plain language of this provision that BP's status as an insured is inexorably linked, at least in some respect, to the extent of Transocean's indemnity obligations. What is in dispute is the intended breadth of the limiting language in the emphasized portion of the provision.

BP reads the emphasized language as a narrow and specific exception to the general obligation to name it as an additional insured, applying only to workers' compensation policies covering Transocean's employees since that would be the only indemnity obligation implicated under BP's construction. Transocean and the Insurers read the language as (1) excepting only workers' compensation policies from the general additional-insured obligation and (2) imposing a limitation on the general insurance obligation that is coterminous with all of Transocean's contractual indemnity obligations. BP asserts that such an interpretation is unreasonable because there is a comma before, but not after, the phrase "except Workers' Compensation" and further contends that a comma cannot be inserted where it does not exist when it would alter the plain meaning of the contract.[14]

In construing the additional-insured provision, we give effect only to reasonable

---

[14] The parties dispute whether Texas or maritime law governs this construction issue based on a perceived difference as to the weight accorded missing punctuation under these bodies of law. *Compare Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 136 S.W.2d 800, 804 (Tex. 1940) ("[W]e may insert the comma, in order to ascertain from the words used the intention of the parties.") *with Jagenberg, Inc. v. Georgia Ports Auth.*, 882 F. Supp. 1065, 1076 n.10 (S.D. Ga. 1995) (distinguishing between provisions because "[n]o such punctuation was used . . . neither parentheses nor a comma or other device") (applying maritime law). Transocean and the Insurers contend Texas law applies because the policies apply Texas law, which, in turn, incorporate the Drilling Contract's additional-insured limits by reference. BP relies on the choice-of-law provision in the Drilling Contract, which mandates construction under general U.S. maritime law, subject only to its conflict-of-laws principles. We need not decide this issue, however, because both Texas and maritime law require us to examine the agreement as a whole to give its words their plain meaning and render none meaningless. *See Schaefer*, 124 S.W.3d at 159 ("In addition to applying the plain meaning of the policy's language, we must also read the policy as a whole, giving effect to each provision."); *Becker*, 586 F.3d at 369 ("A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous." (quotation marks omitted)).

interpretations of the contract's terms. As construed by BP, Transocean was obligated to name BP as an additional insured under every type of insurance policy specified in Exhibit C, including workers' compensation polices for liabilities assumed by BP, but not workers' compensation policies for liabilities assumed by Transocean. BP's construction of the contract is not reasonable because it is either inconsistent with other provisions in the Drilling Contract or renders the words "liabilities assumed by [Transocean] under the terms of this contract" meaningless.

Assuming third-party additional-insured coverage for workers' compensation claims is available, which Transocean and the Insurers dispute, construing the additional-insured provision to require BP to be named as an insured under such policies for its own employees' work-related losses is in tension with at least two other provisions in the Drilling Contract. The first is the employee-indemnity clause in which BP assumed responsibility for "all claims, demands and causes of action" asserted by its employees for work-related "personal injury," including bodily injury and death. The second involves the provision in Exhibit C that imposes an obligation on Transocean to obtain workers' compensation insurance for "employees"; it does not mention acquiring insurance for workers "employed" by someone other than the contractor, Transocean.

If third-party additional-insured coverage for workers' compensation claims cannot be secured, as Transocean and the Insurers claim, the universe of workers' compensation policies that would exist would be inherently limited to covering Transocean's employees. In that case, a carve-out for workers' compensation policies covering Transocean's employees adds nothing and would, therefore, be superfluous and functionally inoperative. We will not construe the absence of a comma to produce an unreasonable construction. *See Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009) (requiring construction of agreement as a whole to give words their plain meaning); *Schaefer*,

20

124 S.W.3d at 159 (refusing an interpretation that would render certain contract language meaningless).

Our inquiry does not end there, however, as we can only credit Transocean and the Insurers' alternative construction if it is reasonable. We conclude that it is. Transocean and the Insurers' construction is in harmony with the allocation of liabilities in the contract, gives meaning to all the language the parties employed, and is consistent with the standard use of such language and the purpose of such clauses. Additional-insured provisions are often phrased in terms of extending coverage to all policies except workers' compensation policies, which quintessentially involve an employer insuring its own employees.[15] Moreover, a manifest purpose of an additional-insured clause is to provide supplemental protection when the additional insured may be sued for conduct within the contractor's scope of risk.[16] Applying the only reasonable construction of the additional-

---

[15] *See, e.g.*, *Garza v. Exel Logistics*, 161 S.W.3d 473, 480-81 (Tex. 2005) (contract required client company to be named as an additional insured in various policies of the temporary employment agency "but not 'Workers' Compensation' coverage"); *Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483, 487 (5th Cir. 2009) (contract required contractor to name owner and affiliates "as additional insureds in each of Contractor's policies, except Workers' Compensation . . . ."); *Dowling v. Georgia-Pacific Corp.*, No. 08-30218, 2008 WL 5170669, at *4 (5th Cir. Dec. 10, 2008) ("Except for the Workers' Compensation Insurance, and to the extent of Contractor's obligations under this agreement, G-P shall be an additional insured on all such policies of insurance." (emphasis omitted)); *Pasadena Ref. Sys., Inc. v. McRaven*, Nos. 14-10-00837-CV, 14-10-00860-CV, 2012 WL 1693697, at *14 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd by agr.) (contract required contractor to name owner "as an additional insured in all such certificates, *except insurance providing protection against worker's or workmen's compensation claims . . . .*" (emphasis added)); *Apache Indus. Painting v. Gulf Copper & Mfg. Corp.*, No. 01-08-00812-CV, 2010 WL 1611450, at *3 (Tex. App.—Houston [1st Dist.] Apr. 22, 2010, no pet.) ("The Nabors Group shall be named as additional insureds in each of Contractor's policies, except Workers' Compensation."); *Lewis v. Nevada*, No. 2:07-CV-01109-KJD-LRL, 2010 WL 3860642, at *1 (D. Nev. Sept. 28, 2010) (contract required contractor to name the owner as an additional insured "except on workers' compensation insurance coverage"); *PIC Group, Inc. v. LandCoast Insulation, Inc.*, 718 F. Supp. 2d 795, 797-98 (S.D. Miss. 2010) ("Such insurance, except workers' compensation, shall name PIC and Customer as an additional insured."); *BJ Servs. Co., USA v. Thompson*, No. 6:08-510, 2010 WL 2024725, at *5 (W.D. La. May 14, 2010) ("Company Group shall be named as Additional Insured on those policies (except Workers Compensation coverage)."). Likewise, the underlying contract in *ATOFINA* required Triple S to name ATOFINA "as an additional insured in each of [Triple S's] policies, *except Workers' Compensation . . . .*" 1 ATOFINA CR 71 (emphasis added).

[16] *Cf.* 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES & INSUREDS § 11:30A (6th ed. 2013) ("As a general rule, no premium is charged for making the third party an additional insured because it is the insurance company's intent . . . that the third party be an insured solely for any vicarious liability

21

insured provision, we conclude that BP is an additional insured only as to liabilities assumed by Transocean under the Drilling Contract and no others. Because Transocean did not assume liability for subsurface pollution, Transocean was not "obliged" to name BP as an additional insured as to that risk. Because there is no obligation to provide insurance for that risk, BP lacks status as an "Insured" for the same.

Despite the additional-insured clause's explicit reference to the liabilities Transocean assumed in the Drilling Contract, BP contends that clause cannot limit BP's additional-insured status to the extent of Transocean's indemnity obligations because the Drilling Contract's indemnity and insurance provisions are separate and independent. As support, BP relies on Article 20.1 of the Drilling Contract, which provides that "[w]ithout limiting the indemnity obligation or liabilities of [Transocean] or its insurer, at all times during the term of this CONTRACT, [Transocean] shall maintain insurance covering the operations to be performed under this CONTRACT as set forth in Exhibit C." BP takes this to mean that the insurer's indemnity obligation (which is conferred by the insurance policy) cannot be limited by anything in Exhibit C. BP's argument is unavailing for at least two reasons.

First, Transocean's insurers owe no indemnity obligation to BP except on the terms stated in subsection 3 of Exhibit C; so while Article 20.1 might generally be read as saying that the insurer's indemnity obligation is not limited by the requirements in Exhibit C, the insurer's indemnity obligation to BP does not arise in the first instance except on the conditions stated therein.

---

created by the named insured's conduct, not for the third party's own negligence."); Shilliday, *supra* note 5, at 1618 ("Frequently, a contractor/indemnitor entering into a contractual indemnity arrangement is asked to supplement its indemnity obligation with a commitment to procure insurance to cover its own liabilities and also to cover its indemnity obligation to the customer. It is also common that the contractor/indemnitor will be asked to name the customer/indemnitee as an additional insured under the indemnitor's liability policy.").

Second, BP's argument conflates duty with scope. We have long recognized that the contractual duties to indemnify and to maintain insurance may be separate and independent.[17] Consequently, a statute invalidating an indemnification clause does not relieve a party of a separate duty to obtain insurance. *See Getty*, 845 S.W.3d at 804; *see also* TEX. CIV. PRAC. & REM. CODE § 127.005 (exempting from the Texas Oilfield Anti-Indemnity Act certain indemnity agreements supported by liability insurance furnished by the indemnitor). But simply because the duties to indemnify and maintain insurance may be separate and independent does not prevent them from also being congruent; that is, a contract may reasonably be construed as extending the insured's additional-insured status only to the extent of the risk the insured agreed to assume.

Such is the case here. The Drilling Contract required Transocean to name BP as an additional insured only for the liability Transocean assumed under the contract. Accordingly, Transocean had separate duties to indemnify and insure BP for certain risk, but the scope of that risk for either indemnity or insurance purposes extends only to above-surface pollution. Article 20.1 of the Drilling Contract, on which BP relies, provides that Transocean's duty to maintain insurance does not alleviate its duty to indemnify BP. This merely confirms our holding in *Getty Oil Co. v. Insurance Co. of North America* that indemnity and insurance clauses can impose separate and independent duties. 845 S.W.3d at 804. Article 20.1 does not provide that the scope of the indemnity and insurance duties are different. Instead, the additional-insured clause confirms they are congruent regarding the risk at issue by requiring Transocean to insure BP "for liabilities

---

[17] *See ATOFINA*, 256 S.W.3d at 670 ("We disapprove the view that this kind of additional insured requirement fails to establish a separate and independent *obligation* for insuring liability." (emphasis added)); *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 804 (Tex. 1992) ("[T]he additional insured provision of the contract does not support the indemnity agreement, but rather is a separate *obligation*." (emphasis added)).

23

assumed by [Transocean] under the terms of this Contract." Because the scope of Transocean's duty to indemnify governs the scope of Transocean's duty to insure BP, we decline BP's request to ignore the indemnity obligation when construing the Drilling Contract.

In sum, we answer the first certified question in the negative because BP is not covered for the damages at issue by virtue of the limitations on the scope of its additional-insured status imposed in the Drilling Contract and incorporated into the Transocean insurance policies by reference.

## C. Applicability of the *Contra Proferentum* Doctrine

The second certified question asks whether the ambiguity rule governs interpretation of the insurance-coverage provision in the Drilling Contract, given the facts of this case. 728 F.3d at 500. The certified question is directed to resolving the parties' disagreement about whether the rule should apply to insurance-coverage disputes between sophisticated parties as well as the extent to which the rule applies to a contract incorporated by reference into an insurance policy. The ambiguity rule comes into play only if there is more than one reasonable interpretation of an insurance policy. *See ATOFINA*, 256 S.W.3d at 668. Because that is not the situation here, we do not answer the second question.

## III. Conclusion

Texas law has long allowed insurance policies to incorporate other documents by reference, and policy language dictates the extent to which another document is so incorporated. The policies here provide additional-insured coverage automatically where required and as obligated by written contract in which an insured has agreed to assume the tort liability of another party. Because BP is not named as an insured in the Transocean policies or any certificates of insurance, the insurance policies direct us to the additional-insured provision in the Drilling Contract to determine the

24

existence and scope of coverage. Applying the only reasonable construction of that provision, we conclude that, as it pertains to the damages at issue, BP is an additional insured under the Transocean policies only to the extent of the liability Transocean assumed for above-surface pollution. We therefore answer the first certified question in the negative and refrain from answering the second question.

_____

Eva M. Guzman
Justice

**OPINION DELIVERED:** February 13, 2015