# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 14, 2022

Lyle W. Cayce
Clerk

No. 20-50892

Cimarex Energy Company; St. Paul Fire & Marine Insurance Company, *as Subrogees of Cimarex Energy Company*; American Guarantee & Liability Insurance Company, *as Subrogees of Cimarex Energy Company*,

*Plaintiffs—Appellants*,

*versus*

CP Well Testing, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
No. 7:19-cv-00068

Before Owen, *Chief Judge*, Jones, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

The Texas Oilfield Anti-Indemnity Act ("TOAIA") voids indemnity agreements that pertain to wells for oil, gas, or water or to mineral mines, unless the indemnity agreement is supported by, *inter alia*, liability insurance. Here, pursuant to TOAIA, CP Well Testing, LLC and Cimarex Energy Co. agreed in a Master Service Agreement (the "MSA") to obtain a minimum amount of insurance coverage to indemnify one another. CP Well obtained

No. 20-50892

more coverage than the minimum required by the MSA, but its insurance policy contains a proviso limiting indemnity coverage. After an accident, Cimarex settled with the injured party for an amount above the minimum indemnity required by the MSA. In the wake of that settlement, a dispute arose between CP Well and Cimarex over CP Well's indemnification obligation. At issue is how much insurance CP Well obtained "for the benefit of the other party as indemnitee." Tex. Civ. Prac. & Rem. Code Ann. § 127.005(b). The district court considered the terms of CP Well's insurance policy to answer that question and granted summary judgment for CP Well based on the court's conclusion that CP Well owed Cimarex no further indemnity beyond the MSA's minimum. We AFFIRM.

## I.

The underlying facts are undisputed. In 2010, CP Well and Cimarex entered into the MSA. Thereafter, Cimarex hired CP Well to work at an oil well in Oklahoma that was owned and operated by Cimarex. CP Well assigned Johnny Trent, an employee of one of its subcontractors, to work at the well. On April 25, 2015, a flash fire occurred at the well and Trent was severely burned.

On January 8, 2016, Trent sued Cimarex, CP Well, and Cudd Energy Services, Inc. in Oklahoma state court for his injuries.[1] Cimarex and its insurers, St. Paul Fire & Marine Insurance Company and American

---

[1] Cudd Energy Services, Inc.'s employees were working on the oil well when Trent was injured. Cudd and Cimarex entered into a separate services agreement that included a contractual indemnity obligation between the two parties. Cudd is not a party to this lawsuit.

No. 20-50892

Guarantee & Liability Insurance Company, (collectively "Cimarex") settled the underlying lawsuit with Trent for $4.5 million.[2]

The MSA contains a mutual indemnity provision that required Cimarex and CP Well to indemnify each other from "claims arising out of performance of [the MSA], regardless of fault, involving: (a) damage to or loss of any equipment or property of any member of the contractor group, or (b) personal injury, illness, or death of any member of [the] contractor group."   The parties were also required, "[i]n support of the mutual indemnity obligations, duties, and liabilities each Party assume[d] in th[e MSA], . . . at [their] own cost, to obtain and maintain, for the benefit of the other Party . . . as Indemnitees, liability insurance."  CP Well was obligated to obtain a minimum of $1 million in commercial general liability ("general liability") insurance and $2 million in umbrella or excess liability ("excess liability") insurance.  CP Well obtained a $1 million general liability policy and an excess liability policy with coverage limits of $10 million, i.e., $8 million more than the minimum coverage required by the MSA.  For its part, Cimarex was required to obtain $1 million in general liability insurance and $25 million in excess liability insurance, which it did in due course.

After the Trent settlement, Cimarex sought indemnity from CP Well. CP Well paid Cimarex $3 million, but it refused to indemnify Cimarex for the remaining $1.5 million, relying on the language of the MSA's indemnity provision.  Disagreeing with CP Well's interpretation of their contract, Cimarex brought this action against CP Well for the settlement balance.

---

[2] St. Paul wrote Cimarex's general liability insurance policy.  American Guarantee wrote a "Commercial Umbrella Liability Policy" that covered Cimarex's excess liability. They sue CP Well here as Cimarex's subrogees to recoup $1.5 million of the $4.5 million paid to Trent to settle the underlying lawsuit. St. Paul separately paid Trent on behalf of Cudd as part of the settlement between Cimarex and Trent, but that payment is not at issue in this case.

3

No. 20-50892

Cimarex sought a declaration that CP Well had a contractual duty to defend and indemnify Cimarex against Trent's claims up to $11 million (CP Well's total insurance coverage). After discovery, Cimarex and CP Well filed cross-motions for summary judgment.

Deciphering the indemnity issue, the district court was guided by the Texas Supreme Court's application of TOAIA in *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344 (Tex. 2000). *See St. Paul Fire & Ins. Co. v. CP Well Testing, LLC*, 489 F. Supp. 3d 635, 641–42 (W.D. Tex. 2020). The district noted that *Ken Petroleum* held that § 127.005(b) of TOAIA "contemplate[d] that the mutual indemnity obligations will be enforceable only up to 'the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to provide in equal amounts to the other party as indemnitee.'" *Id.* at 642 (quoting *Ken Petroleum*, 24 S.W.3d at 350 (discussing then-operative 1991 version of Tex. Civ. Prac. & Rem. Code Ann. § 127.005)). "Thus, '[w]hen the parties agree to provide differing [or unspecified] amounts of coverage, the mutual indemnity obligations are limited to the lower amount of insurance.'" *Id.* (quoting *Ken Petroleum*, 24 S.W.3d at 351) (alterations in original).

Muddling the issue, Cimarex and CP Well contested "whether the MSA included a specific dollar amount of insurance each party was supposed to obtain." *Id.* In answering this question, the district court concluded that in the MSA, "the parties merely agreed to a floor" of indemnity insurance that CP Well agreed to obtain—general liability coverage of $1 million and excess liability coverage of at least $2 million—and did not set a specific level of coverage. *Id.* at 643. "Because the MSA does not limit the amount of coverage the parties agreed to obtain to support their indemnity obligations," the court then looked to TOAIA to determine "the lowest common denominator of insurance coverage between the parties." *Id.* (internal quotation marks and citations omitted). The district court centered that

No. 20-50892

analysis on "the amount of coverage CP Well agreed to obtain for Cimarex's benefit."  *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 127.005(b)).

CP Well contended that it only agreed to maintain $1 million in general liability insurance and $2 million in excess liability insurance to meet its indemnification obligation under the MSA; the remaining coverage in its excess liability coverage was thus not for the benefit of Cimarex.  In response, Cimarex contended that because CP Well obtained a $1 million general liability policy and a $10 million excess liability policy, CP Well effectively agreed to maintain $11 million in indemnity coverage for Cimarex's benefit.

The district court looked to the terms of CP Well's excess liability policy to resolve the dispute. *Id.* at 644–45.  Subsection E of CP Well's excess liability policy states:

> [T]he most [the insurer] will pay for damages under this policy on behalf of any person or organization to whom [CP Well] [is] obligated by written **Insured Contract** to provide insurance such as is afforded by this policy is the lesser of the Limits of Insurance shown in Item 3. of the Declarations [i.e., $10 million,] or the minimum Limits of Insurance [CP Well] agreed to procure in such written **Insured Contract**.

The policy defines "Insured Contract" as "any contract or agreement pertaining to [CP Well's] business under which any **Insured** assumes the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization."  The district court noted that the "parties agree[d] that the MSA" falls within the policy's definition of "Insured Contract." *Id.* at 644.  It then determined that the "lesser of the Limits of Insurance . . . or the minimum Limits of Insurance" CP Well agreed to procure was the MSA's $3 million minimum total indemnity coverage ($2 million of which was encompassed by the excess liability policy

coverage). *Id.* at 644–45. The district court in turn held that CP Well did not breach the MSA because CP Well was only required to indemnify Cimarex up to $3 million. *Id.* at 645. Consequently, the district court granted CP Well summary judgment and denied Cimarex's competing motion. *Id.* at 646.

Cimarex now appeals.

## II.

"We review de novo the district court's grant of summary judgment on [a] question of contract interpretation." *Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd.*, 788 F.3d 456, 459 (5th Cir. 2015). Questions of statutory interpretation are also reviewed de novo. *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964 (5th Cir. 2019). In a diversity case like this one, we apply state substantive law, i.e., that of Texas. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996).

### A.

Cimarex contends that TOAIA, as construed by the Texas Supreme Court, prohibited the district court from considering the terms of CP Well's insurance policy when it determined the scope of CP Well's contractual indemnity obligation in the MSA. *See Ken Petroleum*, 24 S.W.3d at 351–55. According to Cimarex, *Ken Petroleum* requires that courts look only to the "lower amount of insurance" that both CP Well and Cimarex maintained and enforce the indemnity obligation up to that amount, which here is $11 million. *See id.* at 351. We disagree.

In Texas, "[c]ontract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *see also Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) ("[The court] give[s] terms their plain, ordinary, and generally accepted meaning . . . [and] will enforce the

unambiguous document as written." (citations omitted)).  Looking first to the MSA, the district court correctly determined that the agreement sets a minimum amount of insurance—a "floor"—that CP Well and Cimarex each agreed to obtain to support their respective indemnity obligations, consistent with TOAIA's safe harbor provision.  *CP Well Testing*, 489 F. Supp. 3d at 634; *see* Tex. Civ. Prac. & Rem. Code Ann. § 127.005.  The floor for each party is different:  CP Well was required to obtain a minimum of $1 million of general liability coverage and $2 million of excess liability coverage, for at least $3 million in total coverage.  Cimarex was required to obtain a minimum of $1 million in general liability coverage and $25 million in excess liability coverage, for at least $26 million in total coverage.  The language of the MSA is plain as far as what the parties were required to do. And when CP Well obtained its $10 million policy, it clearly met the $2 million minimum excess liability coverage specified in the MSA and thus complied with its indemnity obligation under the agreement.

The rub is that the MSA sets the floor, but not the ceiling.  While CP Well was free to obtain *more* than $2 million in excess liability coverage, voluntarily increasing its indemnification coverage for Cimarex's benefit, it was not required by the MSA to do so.  And the MSA does not speak to how the parties' mutual obligations are to be determined when, as here, one party or the other obtains more coverage than the MSA's required minimum.

Enter TOAIA.  The statute states that, "[w]ith respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance . . . each party as indemnitor has agreed to obtain for the benefit of the other party as indemnitee."  Tex. Civ. Prac. & Rem. Code Ann. § 127.005(b). Given the MSA's silence on this issue, the operative question is how to determine how much of CP Well's additional $8 million in excess liability coverage was "for the benefit of [Cimarex] as indemnitee."  *Id.*  The district court consulted CP Well's

excess liability policy language and concluded that *none* of the additional coverage was procured for Cimarex's benefit as indemnitee, and therefore that CP Well was not required to pay more than $3 million to Cimarex.

Cimarex contends that the district court improperly conducted a "coverage analysis" by considering the terms of CP Well's insurance policy when it answered this question. Cimarex asserts that under *Ken Petroleum*, the district court should only have compared the parties' respective coverage to determine the "lowest common denominator" and enforced the indemnity obligation up to that amount. As Cimarex notes, *Ken Petroleum* instructs that "[w]hen the parties agree to provide differing amounts of [insurance] coverage, the mutual indemnity obligations are limited to the lower amount of insurance." 24 S.W.3d at 351. Well and good, but that does not supply the whole answer for this case.

First, *Ken Petroleum* applied an earlier version of § 127.005(b), which provided that "a mutual indemnity obligation . . . [was] limited to the extent of the coverage and dollar limits of insurance . . . each party as indemnitor . . . agreed to *provide in equal amounts to the other party as indemnitee*." *Id.* at 349 (quoting 1991 version of § 127.005(b)) (emphasis added). The current version of § 127.005(b), enacted in 1999, deleted the last clause of the statute and instead limited mutual indemnity obligations to the coverage "each party as indemnitor has agreed to *obtain for the benefit of the other party as indemnitee*." Tex. Civ. Prac. & Rem. Code Ann. § 127.005(b) (emphasis added). Without addressing how this change might impact *Ken Petroleum*'s analysis, the current text of § 127.005(b) must guide ours.[3]

---

[3] Cimarex contends that the current version of TOAIA is not substantively different than the 1991 version. Whether that is true or not is a question for Texas courts to answer in the first instance. Regardless, we must adhere to the current statute as it is written. *E.g.*, *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) ("We limit

No. 20-50892

Second, *Ken Petroleum* resolved questions that only took the district court so far in this case. *Ken Petroleum* held that parties to an indemnification agreement were not required to obtain equal amounts of insurance in order for the underlying agreement to be valid; the court also instructed how to determine the amount of mutual indemnity coverage when parties obtained different levels of insurance. 24 S.W.3d at 348–51. If anything, the district court faithfully followed these guideposts. But because there was no way to ascertain via the MSA's framework the coverage each party here obtained for the other's benefit, the district court quite logically turned to CP Well's insurance policy language.

The district court's approach is not just logical; it is consistent with our precedent that, applying Texas law, courts in this circuit routinely consider the terms of insurance policies to determine whether a party is entitled to coverage. *E.g.*, *Ironshore*, 788 F.3d 456; *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1044–45 (5th Cir. 1991); *Musgrove v. Southland Corp.*, 898 F.2d 1041, 1043 (5th Cir. 1990); *see also In re Deepwater Horizon*, 470 S.W.3d 452, 459–60 (Tex. 2015). We thus find no error in the district court's consideration of CP Well's excess liability policy language in determining how much coverage CP Well obtained "for the benefit of [Cimarex] as indemnitee." Tex. Civ. Prac. & Rem. Code Ann. § 127.005(b). And in doing so, it found a ready answer.

As quoted *supra* in Part I, Subsection E of CP Well's excess liability policy states:

> [T]he most [the insurer] will pay for damages under this policy on behalf of any person or organization to whom [CP Well] [is]

---

our analysis to the words of the statute and apply the plain meaning of those words unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." (citations and internal quotation marks omitted)).

No. 20-50892

> obligated by written **Insured Contract** to provide insurance such as is afforded by this policy is the lesser of the Limits of Insurance shown in . . . the Declarations or the minimum Limits of Insurance [CP Well] agreed to procure in such written **Insured Contract**.

"Insured Contract," in turn, is defined as "that part of any contract or agreement pertaining to [CP Well's] business under which any **Insured** assumes the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization." The parties rightly agree that the MSA is an "Insured Contract." The MSA's requirement that CP Well indemnify Cimarex "from and against any and all claims arising out of performance of [the MSA], regardless of fault, involving: (a) damage to or loss of any equipment or property of any member of the contractor group, or (b) personal injury, illness, or death of any member of contractor group[,]" fits squarely within the policy definition. As an "Insured Contract," the MSA therefore also falls within the coverage limitations articulated in Subsection E of the policy.

All that remains is to determine which is less: "the Limits of Insurance shown in . . . the Declarations or the minimum Limits of Insurance [CP Well] agreed to procure in [the MSA]." The excess liability policy's Declarations provide that "[t]he Limits of Insurance, subject to the terms of this policy, are: A. $10,000,000 [for] **Each Occurrence**[, and] B. $10,000,000 [in the] **General Aggregate**." By contrast, in the MSA CP Well agreed to procure minimum coverage of "General Liability insurance with limits of $1,000,000 . . . per occurrence and [in the] aggregate," and excess liability insurance "with minimum limits of $2,000,000 per occurrence and [in the] aggregate." The effect of CP Well's excess liability policy, read against the MSA under the strictures of TOAIA, is to cap coverage for Cimarex as

No. 20-50892

indemnitee at $3 million (the first $1 million of coverage being drawn from CP Well's general liability policy).

In basic terms, CP Well's excess liability policy effectively set the indemnity coverage "ceiling" at the same level as the MSA's "floor." In TOAIA's terminology, the remaining $8 million of CP Well's excess liability coverage was not obtained for the benefit of Cimarex. And as CP Well asserted at oral argument, it was free to obtain additional coverage for its own purposes; nothing required it to obtain its agreed indemnification coverage via a separate policy from coverage it sought for its own interests. To the contrary, irrespective of the additional coverage, CP Well's excess liability policy fulfilled both the terms of the MSA and the requirements of TOAIA, to the extent that CP Well and Cimarex were mutually indemnified up to $3 million, coincident with CP Well's minimum requirements under the MSA.[4] Had Cimarex wanted CP Well to obtain more than the minimum coverage in the MSA, the parties could have so fashioned their agreement. As the MSA was drafted, though, Cimarex could expect nothing beyond the minimum coverage CP Well was required to obtain. In sum, the district court did not err by consulting the terms of CP Well's excess liability policy and concluding that CP Well's indemnity obligation totaled $3 million.

**B.**

Cimarex contends that, even if the district court could properly rely on the terms of CP Well's excess liability policy in determining CP Well's indemnity obligation, Subsection E of the policy is inapplicable. In effect, Cimarex argues that the terms of Subsection E are used in a "technical or

---

[4] To emphasize, if the shoe was on the other foot and CP Well was seeking indemnity from Cimarex, *Ken Petroleum* predicts that CP Well would similarly only be entitled to $3 million even though Cimarex had obtained $26 million in insurance coverage pursuant to the MSA.

11

different sense" rather than in their "plain, ordinary, and generally accepted meanings," as the district court concluded. *Valence Operating*, 164 S.W.3d at 662. More precisely, Cimarex asserts that the similarity between language used in Subsection E and a common definition of "insured" from other cases, *see, e.g.*, *Ironshore*, 788 F.3d at 460; *Deepwater Horizon*, 470 S.W.3d at 457, indicates that Subsection E only applies to coverage of named additional insureds.

"Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally." *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 497 (Tex. 2020) (internal quotation marks and citation omitted). We "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating*, 164 S.W.3d at 662. Thus, we give terms "their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Id.*

Reviewing the text of the excess liability policy, there is no indication that Subsection E is limited only to named additional insureds as Cimarex contends. None of the policy terms invoked by Cimarex are used in the policy in a "technical or different sense." *See id.* To the contrary, "Insured Contract" is plainly defined to include any "agreement pertaining to [the] business under which any Insured assumes the tort liability of another party to pay for Bodily Injury or Property Damage to a third person or organization"—i.e., to include the MSA. (Emphasis omitted.) In turn, the policy defines "Insured" as the "Named Insured," which is just as plainly identified as CP Well. Subsection E thus clearly encompasses the indemnity obligation CP Well undertook in favor of Cimarex, consistent with the MSA and TOAIA. Cimarex's restrictive reading of the policy language is at best inconsistent with the plain text and at worst contorts straightforward policy

No. 20-50892

terms to render them meaningless. In short, we discern no error in the district court's interpretation of the policy language to limit CP Well's indemnity obligations to the minimum coverage levels set by the MSA.

## IV.

The parties in this case agreed to indemnify each other, consistent with TOAIA, by setting a "floor" of required insurance coverage each was to obtain. They were free to procure more. CP Well obtained a policy that expressly set the "ceiling" of coverage "for the benefit [of Cimarex] as indemnitee" at the minimum "floor" provided by the parties' contract. CP Well did not breach its contractual duties to Cimarex in doing so. And the district court did not err in construing either the parties' agreement, or TOAIA, or the insurance policy to delimit CP Well's indemnity obligation to Cimarex. It follows that the district court's summary judgment in favor of CP Well was proper.

AFFIRMED.