**Affirmed and Opinion filed December 17, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00254-CV

**LIBERTY SURPLUS INSURANCE CORPORATION AND COMMERCE & INDUSTRY INSURANCE COMPANY, Appellants**

**V.**

**EXXON MOBIL CORPORATION, Appellee**

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-44838A**

## O P I N I O N

In this insurance-coverage dispute, the trial court granted appellee Exxon Mobil Corporation's traditional motion for partial summary judgment, holding that a contractor's primary and excess commercial general liability policies provided additional-insured coverage to Exxon for personal-injury claims arising out of the contractor's services. Exxon and the insurers resolved the remaining issues by stipulation, and the trial court rendered judgment in Exxon's favor for its costs of

settling the personal-injury suit and in prosecuting the coverage dispute. On appeal, the insurers argue that the underlying contract between Exxon and the contractor, Wyatt Field Service Company, required Wyatt to provide Exxon additional-insured coverage only for liability arising out of Wyatt's ongoing operations, and that the insurance policies incorporate such a coverage limitation. The insurers further argue that summary judgment was improper because there is a fact issue about whether the Exxon's liability arose out of the Wyatt's operations. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Exxon and Wyatt were parties to a five-year contract under which Wyatt would perform "Services" as set forth in various work orders from Exxon's affiliates. The contract also required Wyatt to maintain $5 million of commercial general liability insurance. The parties agreed that the policies must cover Exxon and its affiliates "as additional insureds in connection with the performance of Services," and must be primary to all other policies, including deductibles or self-insured retentions.

In 2008, Wyatt was assigned to work on a flexicoker unit at Exxon's Baytown refinery during an intensive maintenance period known as a "turnaround." The flexicoker unit includes a cylindrical heating tank in which petroleum coke accumulates, and five nozzles are attached around the tank's circumference. Most of the time, these are non-operational "dummy nozzles," and a chain attaches the dummy nozzle to the outside of the tank to prevent the nozzle from being pulled all the way out and releasing the heated coke. Before a turnaround, the "dummy nozzles" are replaced with "quench nozzles" to help cool the coke, and then the dummy nozzles and chains are reinstalled. Wyatt was

2

assigned to reinstall the dummy nozzles and chains, and it completed the services around the end of October 2008.

Three years later, one of the dummy nozzles unexpectedly pulled all the way free from its packing, and the escaping steam and coke burned several of contractor LWL, Inc.'s employees who were working on the unit. After the accident, it was discovered that the safety chain had been installed in the wrong location so that it did not properly secure the dummy nozzle.

The injured workers—David McBride, Glenn Burns, Francisco Escobedo, and Richard Tudon—sued Exxon in the 125th District Court in Harris County. After Exxon designated Wyatt as a responsible third party, the plaintiffs added Wyatt as a defendant, and Exxon and Wyatt asserted cross-claims against each other. Those cross-claims between Exxon and Wyatt were severed from the claims of the injured workers.

Meanwhile, Exxon demanded defense and indemnity from two entities that we will refer to collectively as "the Insurers": Liberty Surplus Insurance Corporation ("Liberty"), which issued Wyatt's primary commercial general liability insurance policy, and Commerce & Industry Insurance Company ("Commerce"), which issued Wyatt's excess umbrella insurance policy. The Insurers denied that they provided Exxon additional-insured coverage for the injured workers' claims, and they did not contribute to Exxon's costs of defense or to its settlement with the injured workers. Exxon filed a separate suit against the Insurers and Wyatt in the 215th District Court of Harris County,[1] and that suit was

---

[1] In the same action, Exxon asserted claims against another insurer and LWL, Inc., but the additional insurer settled the claims against it, and Exxon ultimately dismissed its claims against LWL.

3

consolidated in the 125th District Court with the cross-claims between Exxon and Wyatt that had been severed from the personal-injury suit.

In this, the consolidated case, Exxon filed a traditional motion for partial summary judgment concerning the Insurers' liability, arguing that the policies covered the injured workers' claims against Exxon as an additional insured. Although Liberty later filed its own traditional motion for summary judgment, the trial court granted Exxon's summary-judgment motion before Liberty's motion was heard. After the trial court ruled in Exxon's favor on the issue of the Insurers' liability, Exxon and Wyatt dismissed their claims against one another. Exxon and the Insurers resolved all other matters by stipulation, and the trial court rendered final judgment in accordance with the earlier summary-judgment ruling and the parties' stipulations.[2] The Insurers now appeal that ruling.

## II. STANDARD OF REVIEW

A movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). We review a summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128

---

[2] The parties stipulated to the amount of Exxon's necessary fees and expenses in prosecuting this case; to the amount of Exxon's damages; to the amount and allocation of liability and settlement credit; to the date on which prejudgment interest began to accrue; and to the maximum amount of reasonable and necessary attorneys' fees to be paid in connection with appeals.

4

S.W.3d 211, 215 (Tex. 2003). When reviewing a traditional summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

### III. CONSTRUCTION OF THE POLICIES' ENDORSEMENTS

In their first issue, the Insurers argue that the trial court erred in granting Exxon's motion for summary judgment because Exxon was an additional insured only for liability arising from Wyatt's ongoing operations, not for liability arising from Wyatt's completed operations.[3] This argument depends for its success on whether the Insurers are correct in asserting that one particular additional-insured policy endorsement is the only such endorsement that applies to Exxon. Because the parties' dispute turns on the proper construction of the insurance policy, we begin our review by setting out the pertinent rules of construction that govern our analysis.

### A. Rules of Construction

An insurance policy generally is governed by the same rules of construction that apply to other contracts. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). As with any written contract, our primary concern is to identify the parties' intentions as expressed in the document. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We accordingly begin our analysis with the policy's language. *See JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 602 (Tex. 2015) ("In determining a question of insurance coverage,

---

[3] Liberty additionally argues that, for the same reasons, the trial court erred in denying Liberty's summary-judgment motion. The record shows, however, that the trial court granted summary judgment in favor of Exxon not only before Liberty's motion was heard, but before Exxon had responded to the motion.

5

we look first to 'the language of the policy because we presume parties intend what the words of their contract say.'" (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (sub. op.))). We strive to harmonize the entire agreement, giving effect to all of the policy's words and provisions so that none are rendered meaningless. *Id.* at 603.

Next, we "consider the terms of an underlying contract to the extent the policy language directs us to do so." *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015) (citing *Urrutia v. Decker*, 992 S.W.2d 440, 442 (Tex. 1999)). "Unless obligated to do so by the terms of the policy, however, we do not consider coverage limitations in underlying transactional documents." *Id.* at 460. If the policy does not incorporate any coverage limitations from the underlying contract, then "the insurer's obligation depended on what it contracted to do, not what the insured contracted with another person to do." *Id.* at 461.

If the parties offer differing constructions of the policy but only one is reasonable, then the policy is unambiguous and we will adopt that construction. *See RSUI Indem. Co.*, 466 S.W.3d at 118. But if the policy's provisions are unclear or inconsistent, and after applying the pertinent rules of construction, more than one interpretation is reasonable, then the contract is ambiguous. *See, e.g.*, *J.M. Davidson, Inc.*, 128 S.W.3d at 229 (addressing contracts generally); *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) (specifically addressing insurance policies). An ambiguous contract is construed against the drafter. *Gonzalez*, 795 S.W.2d at 737. Thus, an ambiguous policy is construed against the insurer and in favor of coverage. *See, e.g.*, *id.*; *see also RSUI Indem. Co.*, 466 S.W.3d at 118. Whether a contract is ambiguous is a question of law for the court to decide; the parties' mere disagreement about the contract's meaning does not create an ambiguity. *See In re Deepwater Horizon*, 470 S.W.3d at 464.

**B.** **Endorsement 3, Covering Both Ongoing and Completed Operations**

Liberty's policy includes three endorsements that potentially make Exxon an additional insured. Commerce's policy insures any person or entity that is included as an additional insured under Liberty's policy, "but not for broader coverage than would be afforded" by Liberty's policy. In effect, then, the three endorsements apply to both policies.

We will begin our review with Endorsement 3, because it is the first of the policy endorsements on which Exxon relied in its summary-judgment motion. The text of that endorsement is as follows:

ENDORSEMENT NO. 3

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization with whom you have agreed to add as an additional insured by written contract but only with respect to liability arising out of your operations or premises owned by you.

Thus, our first question is whether there is a written contract in which Wyatt agreed to add Exxon to Wyatt's insurance policies as an additional insured.

**1.** **The policy directs us to the underlying contract to determine who is an additional insured.**

The answer to this question is not disputed: in the underlying written contract, the parties agreed that Wyatt would maintain $5 million of commercial general liability insurance that must "cover [Exxon] and its Affiliates as additional insureds in connection with [Wyatt's] performance of Services." The parties therefore agree that Exxon is an additional insured in some circumstances.

**2.** **The policy does not direct us to the underlying contract to determine the scope of coverage.**

Next, we must determine whether the endorsement incorporates any coverage restrictions that may be found in the underlying contract. "[W]e

7

determine the scope of coverage from the language employed in the insurance policy, and if the policy directs us elsewhere, we will refer to an incorporated document *to the extent required by the policy*." *See In re Deepwater Horizon*, 470 S.W.3d at 460 (emphasis added). The endorsement directs us to look to Wyatt's contract to determine who is an additional insured—that is, whether the one claiming coverage is a "person or organization with whom you [Wyatt] have agreed to add as an additional insured by written contract"—but it does not direct us to the contract to determine the scope of coverage. *See id.* ("Unless obligated to do so by the terms of the policy, however, we do not consider coverage limitations in underlying transactional documents."). The endorsement instead provides its own coverage limitation by specifying that the who-is-an-insured section of the policy is amended to add organizations such as Exxon as additional insureds, "but only with respect to liability arising out of your [Wyatt's] operations."

The Insurers argue that because the policy requires us to look at the underlying written contract to determine who is an insured, we must also refer to the contract's terms to determine the scope of the insurance coverage. We agree that an insurance policy may limit additional-insured coverage to the coverage required by an underlying contract, but we disagree that by referring to an underlying contract, the policy necessarily incorporates all of the contract's terms. *See id.* at 461. The policy instead must clearly manifest the intent to include the extrinsic document as part of the policy. *See id.* at 460; *see also Urrutia*, 992 S.W.2d at 442 ("Texas law has long provided that a separate contract can be incorporated into an insurance policy by an explicit reference clearly indicating the parties' intention to include that contract as part of their agreement."). A few case comparisons serve to illustrate the difference between policy language that

8

incorporates an underlying contract's limitations on coverage and policy language that does not do so.

*Urrutia* provides a simple example of policy language linking the scope of coverage to the terms of an underlying contract. In that case, Penske Truck Leasing Company's commercial business auto policy contained an endorsement that amended the definition of "insured" to include "[b]oth lessees and rentees of covered autos as insureds, but only to the extent and for the limits of liability agreed to under contractual agreement with the named insured." *Urrutia*, 992 S.W.2d at 441. This language clearly manifested the intention to include the rental agreements as part of the policy, "allow[ing] Penske to determine in the rental contracts themselves which customers would be insured and the amount of their respective coverage." *Id.* at 443.

*In re Deepwater Horizon* contains a more complex example of policy language in which the scope of coverage is determined by the underlying contract's coverage limitations. In that case, the policies extended "Insured" status to "[a]ny person or entity to whom the 'Insured' is obliged by oral or written 'Insured Contract' . . . to provide insurance such as afforded by [the] Policy." *In re Deepwater Horizon*, 470 S.W.3d at 457. The policy defined an "Insured Contract" as "any written or oral contract or agreement entered into by the 'Insured' . . . and pertaining to business under which the 'Insured' assumes the tort liability of another party to pay for 'Bodily Injury' [or] 'Property Damage' . . . to a 'Third Party' or organization." *Id.* at 457–58. The Texas Supreme Court explained that "under the express terms of the policies, additional-insured status hinges on (1) the existence of an oral or written contract, (2) pertaining to the business of an 'Insured', and (3) under which an 'Insured' assumes the tort-liability of another party and is 'obliged' to provide insurance to such other party." *Id.* at 458. The

9

policies further provided that "where required by written contract, bid or work order, additional insureds are automatically included hereunder . . . ." *Id.* The underlying contract required BP to be named as an additional insured on Transocean's policies "except . . . for liabilities assumed by [Transocean] under the terms of this contract." *Id.* at 465. Focusing on the policies' use of the terms "obliged" and "where required," as well as on the use of the defined term "Insured Contract," *see id.* at 464, the court concluded that the policies linked BP's status as an insured to the extent of Transocean's contractual indemnity obligations. *Id.* at 465.

A counter-example is found in *Evanston Insurance Company v. ATOFINA Petrochemicals, Inc.*, in which the Texas Supreme Court determined that the relevant policy language did not incorporate coverage limitations from the underlying contract. *See* 256 S.W.3d 660 (Tex. 2008) (op. on reh'g). In that case, ATOFINA and Triple S Industrial Corporation were parties to a service contract in which Triple S agreed to indemnify ATOFINA for personal-injury and property claims sustained during the performance of Triple S's work, except to the extent that the loss was attributable to ATOFINA's sole or concurrent negligence, misconduct, or strict liability. *Id.* at 662. Triple S agreed to carry both primary comprehensive general liability insurance and an umbrella liability policy that "[i]nclud[ed] coverage for contractual liability insuring the indemnity agreement." *Id.* at 662–63. Section III.B.5 of the policy defined an "insured" to include "[a] person or organization for whom you [Triple S] have agreed to provide insurance as is afforded by this policy; but that person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you." *Id.* at 664. Although the policy referred the reader to an underlying agreement to identify who is an insured, the court determined that this language

10

did not incorporate the underlying contract's limitations to the scope of coverage. *See id.* ("Instead of looking, as the court of appeals did, to the indemnity agreement in the service contract to determine the scope of any coverage, we base our decision on the terms of the umbrella insurance policy itself.").

A further example is found in this court's decision in *Pasadena Refining System, Inc. v. McCraven*, Nos. 14-10-00837-CV & 14-10-00860-CV, 2012 WL 1693697 (Tex. App.—Houston [14th Dist.] May 15, 2015, pet. dism'd by agr.) (mem. op.). There, the underlying contract provided that Pasadena Refining was to be added as an additional insured to Austin Industrial Services' policy, but (a) only in the minimum amount required by contract, (b) only with respect to liability arising out of work done by or on behalf of Austin, and (c) only to the extent that the contract required Austin to indemnify Pasadena Refining *Id.* at *14. We concluded that, under the unambiguous language of the additional-insured endorsement, *see id.* at *14–15, Austin's policy incorporated the underlying contract's limitation on the amount of coverage, but neither limited coverage to Austin's contractual indemnity obligation nor incorporated that provision from the contract. *See id.* at *16.

A comparison of the language of Endorsement 3 with the policy language in these four cases illustrates that the endorsement does not incorporate coverage limitations from the underlying contract. It instead "include[s] as an insured *any person or organization with whom [Wyatt] ha[s] agreed to add as an additional insured by written contract* but only with respect to liability arising out of [Wyatt's] operations or premises owned by [Wyatt]." (emphasis added). Thus, it refers the reader to the written contract when identifying who is an insured, but not when limiting the circumstances under which such a person or organization is considered to be an insured. Because we do not consider the underlying contract's

coverage limitations "[u]nless obligated to do so,"[4] we do not consider any such coverage limitations from the underlying contract in connection with Endorsement 3.[5]

Under the unambiguous language of Endorsement 3, Exxon is an additional insured with respect to liability arising out of Wyatt's operations. It therefore is unnecessary for us to consider the coverage available under the remaining, more restrictive endorsements.

---

[4] *See In re Deepwater Horizon*, 470 S.W.3d at 460.

[5] Even if the policy did incorporate the insurance provision of the underlying contract—and it does not—the Insurers still would not prevail. They contend that the only applicable endorsement is Endorsement 7, which applies only to claims arising out of Wyatt's ongoing operations. Their argument focuses on the contract provision requiring Wyatt to provide insurance to "cover [Exxon and its affiliates] as additional insureds in connection with [Wyatt's] performance of Services." Commerce asserts that the insurance provision must refer to ongoing operations because *performance* "is an active verb." Liberty argues that *performance* restricts the meaning of *Services*, or alternatively, that it renders the insurance provision of the service contract ambiguous, and so must be construed against Exxon as the contract's drafter.

Both are mistaken. "Performance" is a noun, and can be used to refer to a future performance, an ongoing performance, or a past performance. *See* 2 THE COMPACT EDITION OF THE OXFORD ENGLISH DICTIONARY 2132 (1971) (defining "performance" as, inter alia, "[t]he carrying out of a command, duty, purpose, promise, etc.; execution, discharge, fulfilment" and as "[s]omething performed or done; an action, act, deed, operation"). Here, it was used without any temporal limitation. The inclusion of the word "performance" does not make the contract ambiguous, because contracts generally do involve an "agreed exchange of performances." *See, e.g.*, *Williams v. Glash*, 789 S.W.2d 261, 263–64 (Tex. 1990) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981)). And—not surprisingly—this contract refers both to "performance of Purchaser's obligations" by the Exxon affiliate that places a work order with Wyatt, and to the "performance of Services" by Wyatt.

Finally, even if we agreed both that the policy incorporated the underlying contract, and that the contract required coverage for ongoing operations, Endorsement 3 would still apply. Endorsement 3 covers claims arising from both ongoing and completed operations; Endorsement 7 limits coverage to claims arising from ongoing operations, but not completed operations. The endorsements "contain disparate limiting language in their definitions of 'insured'"; thus, "each who-is-an-insured clause operates to grant coverage independently." *See ATOFINA*, 256 S.W.3d at 668. We therefore would be required to apply the endorsement that is most favorable to the insured. *See, e.g.*, *id.* at 668–69; *Gonzalez*, 795 S.W.2d at 737; *RSUI Indem. Co.*, 466 S.W.3d at 118. Here, that is Endorsement 3.

## IV. No Genuine Issues of Material Fact

In their second issue, the Insurers contend that the trial court erred in granting summary judgment because there is a genuine issue of material fact about whether the injured workers' claims fall within the coverage afforded to Exxon "with respect to liability arising out of [Wyatt's] operations. Both Insurers make the legal argument that Exxon cannot conclusively establish that claims against it fall within the scope of coverage unless and until Wyatt is found to be liable to the injured workers.[6] In a variation on this argument, Commerce argues that Exxon did not establish that the claims against it arose out of Wyatt's operations, because in the injured workers' personal-injury suit against Wyatt, the jury found that Wyatt was not negligent and that Exxon was solely responsible for the workers' damages. Finally, Commerce makes the broader evidentiary argument that Exxon failed to meet its burden to establish that its liability arose out of Wyatt's work or operations.

### A. Coverage is Neither Dependent on a Finding that Wyatt's Negligence Caused the Accident Nor Excluded by a Finding that Exxon's Negligence was the Sole Cause of the Accident.

In arguing that coverage is dependent on a finding that Wyatt caused the accident and is excluded if Exxon was found to be the sole cause of the accident, the Insurers rely on the procedural posture of the workers' separate personal-injury suit. After the injured workers settled with Exxon, they tried their claims against Wyatt. Although a jury found that Wyatt was not negligent and that Exxon was solely responsible for the workers' injuries, the trial court granted the workers' motion for a new trial. Wyatt challenged that ruling through a petition for writ of

_____

[6] This argument is inapplicable to Liberty's duty to defend Exxon. *See King v. Dall. Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002) ("The duty to defend and the duty to indemnify are distinct and separate duties. An insurer's duty to defend is determined solely by the allegations in the pleadings and the language of the insurance policy.") (footnotes omitted).

13

mandamus filed in this court. *See In re Wyatt Field Serv. Co.*, No. 14-13-00811-CV, 2013 WL 6506749 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, orig. proceeding) (per curiam) (mem. op.). While that proceeding was pending, the Insurers argued unsuccessfully in the trial court that summary judgment was premature because the workers' claims against Wyatt had not yet been retried. Although we denied Wyatt's first petition for failure to include a complete reporter's record, *see id.* at *3–4, Wyatt filed a second petition for writ of mandamus while the appeal in this case was pending. *See In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 148 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. pending]). The workers' claims were not retried, because we conditionally granted Wyatt's petition for writ of mandamus to set aside the order for a new trial. *Id.* at 163.

Whether or not the case is retried is immaterial to this coverage issue. Although the Insurers assume that the existence of coverage depends on whether Wyatt was negligent, the same argument about similar policy language was considered and rejected by the Texas Supreme Court in *ATOFINA*. In that case, a contractor performed services at ATOFINA's refinery. *See ATOFINA*, 256 S.W.3d at 663. One of the contractor's employees drowned while working at the refinery, and ATOFINA demanded coverage under the contractor's policy. *Id.* Under the pertinent policy language, ATOFINA was "an insured only with respect to operations performed by [the contractor]." *See id.* at 664. The insurer argued that the death was caused solely by ATOFINA's negligence, and thus, the occurrence "did not 'respect . . . operations performed by [the contractor]." *Id.*

In evaluating that argument, the Texas Supreme Court examined the case of *Granite Construction Co. v. Bituminous Insurance Cos.*, in which the Seventh Court of Appeals construed a policy that provided additional-insured coverage

14

"only with respect to liability arising out of operations performed for such insured"—language that is virtually indistinguishable from the relevant language in this case. *See id.* at 664 (quoting *Granite Constr. Co. v. Bituminous Ins. Cos.*, 832 S.W.2d 427, 428 (Tex. App.—Amarillo 1992, no writ)). The Texas Supreme Court explained that "*Granite* adopted a fault-based interpretation of 'arising out of operations,' recognizing coverage only if an insured's wrongful act during the operation caused the injury." *Id.*

> The Texas Supreme Court rejected that argument, explaining as follows:

> [R]egardless of the underlying service agreement's terms, we do not follow *Granite* because the fault-based interpretation of this kind of additional insured endorsement no longer prevails. Instead, we interpret "with respect to operations" under a broader theory of causation. Generally, an event "respects" operations if there exists "a causal connection or relation" between the event and the operations; *we do not require proximate cause or legal causation.... The particular attribution of fault between insured and additional insured does not change the outcome*.

*Id.* at 666 (footnotes omitted, emphasis added).

As Commerce correctly points out, the existence of a duty to indemnify often depends on the resolution of disputed facts. *See, e.g., Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 204–05 (Tex. 2004) (sub. op.); *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (per curiam). But that is not so in every case. *See D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 745 (Tex. 2009) ("Where disputed facts are proven in the liability case, whether none, some, or most of the material coverage facts will have been established in that underlying suit depends on the circumstances of the case and other legal and equitable principles."). Under the terms of the policies here, Exxon's additional-insured coverage was neither dependent on a finding that Wyatt was negligent nor excluded if Exxon's negligence were found to be the sole

proximate cause of the workers' injuries. Exxon was an additional insured "with respect to liability arising out of [Wyatt's] operations," and for the reasons discussed in *ATOFINA*, this language does not require proximate cause or legal causation.

The outcome of the injured workers' personal-injury case therefore does not affect the outcome of this insurance dispute, because the injured workers and Exxon were required to prove different things. The workers sought to hold Wyatt liable under a negligence theory of liability, which requires proof that Wyatt proximately caused their damages. *See Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam) ("To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach."). Exxon, however, was not required to prove that Wyatt proximately caused the workers' damages. *See ATOFINA*, 256 S.W.3d at 666. The jury's negligence findings in the underlying case accordingly do not constitute or create a genuine issue of material fact precluding summary judgment. *See Harris County v. Ochoa*, 881 S.W.2d 884, 889 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("A motion for a summary judgment cannot be defeated by the existence of an immaterial fact issue.").

This is not to say that evidence developed in the trial of the underlying personal-injury action would not be important in determining whether the Insurers had a duty to indemnify Exxon. But the parties to this case were free to use that evidence to resolve the factual questions in their coverage dispute—and as discussed below, Exxon did so. *See D.R. Horton-Tex., Ltd.*, 300 S.W.3d at 741 ("In determining coverage, a matter dependent on the facts and circumstances of the alleged injury-causing event, parties may introduce evidence *during coverage litigation* to establish or refute the duty to indemnify.") (emphasis added).

16

**B. Exxon Met Its Burden to Establish that Its Liability Arose Out of Wyatt's Operations.**

Lastly, Commerce contends that Exxon failed to establish that Wyatt installed the dummy nozzle and the chain that would have prevented the dummy nozzle from pulling free. We disagree.

Exxon's summary-judgment evidence included a transcript of the trial testimony of Robert Merryman, Exxon's turnaround planner in 2008. Merryman explained how work assignments from the 2008 turnaround were documented in Exxon's "Primavera" computer program, and he authenticated documents printed or created from the program. He then tracked the task of reinstalling the dummy nozzles from its initial assignment, through its reassignment to Exxon's on-site maintenance contractor, and its final assignment to Wyatt. He explained that the documents showed that Wyatt's work was complete by October 30, 2008. When he was asked during cross-examination if he agreed with an attorney's opinion that a document showing the assignment to Wyatt was "not very clear," he answered, "No." Finally, Merryman was asked whether, in all the documents he had reviewed or been shown during the course of the litigation, he had seen anything to suggest that anyone other than Wyatt had done the work. He answered, "No, sir."

Exxon also produced the authenticated accident report of Timothy J. McCarthy, which included photographs and diagrams of the cylindrical heating tank of the flexicoker unit and the dummy nozzles, together with explanations of where the chain to each nozzle should have been attached; where the chains instead had been attached; and the amount of chain "slack" created by the incorrect placement. These materials supported the conclusion of the accident-investigation team that the accident would not have happened but for the incorrect placement of the dummy nozzle's chain.

In addition to this material, Exxon produced the Insurers' denial-of-coverage letters, in which each Insurer appeared to acknowledge that Wyatt performed the work on the flexicoker in October 2008. In its letter, Liberty stated, "We understand that Wyatt's work on the Flexicoker unit was completed in October 2008," and Commerce similarly stated, "Wyatt completed its work on the at-issue flexicoker unit in October 2008." Liberty went even further, stating in its summary-judgment response that it was undisputed that "Exxon hired Wyatt to install a valve on a flexicoker unit," and that "three years after Wyatt installed the valve . . . , four workers . . . were injured when the valve allegedly came loose."

In sum, Exxon's evidence showed that Wyatt did the work, and the Insurers did not respond with controverting evidence. Exxon was sued because of the work that Wyatt did. After reviewing the summary-judgment evidence in the light most favorable to the Insurers and drawing all reasonable inferences in their favor, we conclude that Exxon met its burden to establish that the claims against it fall within its additional-insured coverage "with respect to liability arising out of" Wyatt's operations. We accordingly overrule the Insurers' second issue.

## V. CONCLUSION

Having overruled each of the issues presented, we affirm the trial court's judgment.

/s/     Tracy Christopher
         Justice


Panel consists of Justices Christopher, Donovan, and Wise.

18