**Opinion filed February 12, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00054-CV
_____

### LONE STAR WELL SERVICE LLC, Appellant

### V.

### RMTDC OPERATIONS D/B/A/ TOTAL ENERGY SERVICES, LLC AND DANIEL RAMIREZ, Appellees

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV55368**

### O P I N I O N

This appeal concerns the extent to which the Texas Oilfield Anti-Indemnity Act (TOAIA) affects an "oilfield" indemnity agreement and whether the statute in this instance bars a demand for defense and indemnification. TEX. CIV. PRAC. & REM. CODE ANN. §§ 127.001–.007 (West 2020 & Supp. 2025). The matter before us arises from claims for defense and indemnification that Appellees, RMTDC

Operations d/b/a Total Energy Services, LLC and Daniel Ramirez,[1] asserted against Appellant, Lone Star Well Service LLC, in connection with a separate, personal injury lawsuit filed in Ector County by David Salmons, a Lone Star employee. After a bench trial, the trial court signed a judgment in favor of Total and determined that Lone Star is obligated to defend and indemnify Total in the Ector County suit without any monetary limitation.

In four issues, Lone Star contends that the trial court erred when it: (1) failed to find that Total's claims for defense and indemnity were barred by TOAIA; (2) awarded attorney's fees and expenses to Total; (3) alternatively, failed to limit any indemnity obligation in accordance with TOAIA; and (4) alternatively, prematurely determined that Lone Star owes an unqualified, future indemnity obligation to Total while the Ector County suit remained pending. For the reasons expressed below, we affirm in part, and we reverse and remand in part.

## I. *Background*

Lone Star executed a master services agreement (the Lone Star MSA) with Parsley Energy Operations, LLC, to provide oilfield goods and services to Parsley at the Patterson 5-8 2801H Oil and Gas Well (the Patterson Well) in Glasscock County, which Parsley owns and operates. The Lone Star MSA includes a mutual indemnity provision.

Total also executed an MSA (the Total MSA) with Parsley that included an indemnity provision. According to its discovery responses, Total is a placement service provider that locates qualified "Company Men" who are retained and then become the well operator's representative at the wellsite. Pursuant to the Total MSA, Ramirez was assigned by Total to be Parsley's "well consultant" or "Company Man" for the Patterson Well.

---

[1]For ease of reference, we refer to the Appellees collectively as "Total" and specifically refer to Ramirez only where necessary.

The parties to this appeal agree that the Lone Star MSA contains a "knock-for-knock" mutual indemnity provision—a scheme whereby each party to the agreement contractually assumes the responsibility for injuries sustained by their employees and damage to their property, irrespective of who caused the injury or damage—which provides for mutual defense and indemnity obligations between Parsley and Lone Star. It states that Lone Star is obliged to defend and indemnify the "Company Group," which is defined as "Company [Parsley], Company's contractors and/or subcontractors of any tier . . . and/or its and/or their owners, co-owners, joint venturers, directors, officers, employees, agents, invitees, parent(s), affiliates and/or subsidies, direct and remote," for, *inter alia*, personal injury claims asserted by members of the "Contractor Group," which is defined as "Contractor [Lone Star], Contractor's contractors and/or subcontractors of any tier, and/or its and/or their owners, co-owners, joint venturers, directors, officers, employees, agents, invitees, parent(s), affiliates and/or subsidiaries, direct and remote." Parsley is likewise obliged to defend and indemnify the "Contractor Group" for the same types of claims.

The Lone Star MSA requires that each party to the agreement maintain in effect a $1 million primary general liability insurance policy and a $10 million excess liability insurance policy to support its mutual indemnity obligations for benefit of the other. The parties further agreed to "provide coverage for each member of the [other's] Group as 'additional insureds'" under their respective policies of insurance, "relative to the risks and liabilities (including but not limited to indemnity risks and liability) allocated" by the agreement.

The Total MSA also includes a "knock-for-knock" mutual indemnity provision, but the "Company Group" that Total is obliged to defend and indemnify is more narrowly defined. This indemnity provision states that Total shall defend and indemnify "Company [Parsley], and Company's directors, officers, employees,

3

agents, parent, affiliates and subsidiaries, direct and remote" against, *inter alia*, personal injury claims asserted by "Contractor's directors, officers, employees or agents." Parsley similarly must defend and indemnify the "Contractor Group," identically defined, against, *inter alia*, personal injury claims asserted by "Company's directors, officers, employees or agents." The Total MSA further requires that Total maintain in effect $1 million of primary general liability insurance and $5 million of excess liability insurance.

Salmons was injured while working at the Patterson Well, and he filed the aforementioned personal injury lawsuit in the 358th District Court of Ector County against Parsley, Total, and others who are not parties to this appeal.[2] Parsley later filed the underlying declaratory judgment action, which is the subject of this appeal, against Lone Star, alleging that, pursuant to the MSA they executed, Lone Star owes a defense and indemnity to Parsley for the claims arising from and asserted against it in the Ector County suit. Total intervened and asserted a claim against Lone Star for breach of contract; it also sought declaratory relief and a defense and indemnification from Lone Star and claimed that they "are express third-party beneficiaries" of the Lone Star MSA.

Parsley subsequently dismissed its claims against Lone Star.[3] The remaining parties'—Lone Star, Total, and Ramirez—filed competing motions for summary judgment, which the trial court denied; the case thereafter proceeded to a bench trial. After the bench trial, the trial court signed its final judgment in which it (1) found that Lone Star is obligated to defend and indemnify Total in the Ector County suit,

---

[2]The Ector County suit was disposed of pursuant to an agreed judgment signed by the presiding judge of the 358th District Court on November 8, 2024. However, the disposition of the Ector County suit does not moot the issues that are presented in this appeal.

[3]At the time, Lone Star's general liability insurer, Great Midwest Insurance Company, was also a party to this suit by virtue of the third-party claims asserted by Lone Star and the crossclaim asserted by Total and Ramirez. All claims by or against Great Midwest were severed into a separate trial court cause number.

and (2) awarded Total the attorney's fees it incurred in the declaratory judgment action, the attorney's fees it incurred in the Ector County suit, future contingent attorney's fees, and court costs.

## II. *Standard of Review*

In an appeal from a judgment after a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Villa v. Villa*, 664 S.W.3d 415, 418 (Tex. App.—Eastland 2023, no pet.). However, when, as in this case, no findings of fact and conclusions of law are made, we must imply all necessary findings to support the trial court's judgment. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Implied findings of fact may be challenged for legal and factual sufficiency in the same manner as jury findings or a trial court's express findings of fact when the record includes a reporter's record. *Bradberry*, 526 S.W.3d at 480; *see Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

We will affirm the trial court's judgment if it can be upheld on any legal theory that is supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). On appeal, questions of statutory construction are reviewed de novo. *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017); *City of Stephenville v. Belew*, 692 S.W.3d 347, 362 (Tex. App.—Eastland 2024, pet. denied). Further, a right to contractual indemnity is reviewed and determined in the same fashion as other contractual rights—as a matter of law. *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 815 (Tex. 1994); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 125 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

### III. *Analysis*

#### A. *TOAIA Does Not Void Total's Claims for Defense and Indemnity*

In its first issue, Lone Star contends that the trial court erred when it failed to find that Total's claims for defense and indemnity are statutorily barred under TOAIA because, according to Lone Star, Total's claims fail to conform to and comply with the requirements of TOAIA's safe harbor provision in that: (1) there is (a) no written indemnity agreement between Lone Star and Total, (b) no mutual indemnity obligation between the parties, and (c) no mutual, reciprocal, and equivalent insurance obligation to support indemnification; (2) the Total MSA provides limited mutual defense and indemnity obligations for claims asserted against Parsley and Total by each other's "[d]irectors, officers, employees, or agents," but not for claims asserted against their contractors or subcontractors; and (3) the insurance obligations undertaken by Total pursuant to the Total MSA differ materially from those undertaken by Lone Star in the Lone Star MSA. *See* Civ. Prac. & Rem. §§ 127.003, .005(a)–(b).

Total responds that Lone Star is obligated to defend and indemnify it in the Ector County suit because it is a third-party beneficiary under the Lone Star MSA, which satisfies TOAIA's safe harbor provision requirements. We agree with Total.

#### 1. *Pass-Through Indemnity*

"An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability." *Dresser Indus. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). In the oil and gas industry, the "knock-for-knock" indemnity scheme is a frequently used risk-allocation device which "require[s] each party to contractually assume responsibility for injuries to its own employees and damage to its own property[] without regard to who caused the injury or how much damage occurred." *In re Deepwater Horizon*, 470 S.W.3d 452, 456 n.5 (Tex. 2015) (quoting Daniel B. Shilliday et al., *Contractual Risk-Shifting in*

6

*Offshore Energy Operations*, 81 Tul. L. Rev. 1579, 1599 (2007)); *see Nabors Drilling USA, L.P. v. Encana Oil & Gas (USA) Inc.*, No. 02-12-00166-CV, 2013 WL 3488152, at *5 (Tex. App.—Fort Worth July 11, 2013, pet. denied) (mem. op.) (stating that "at drilling sites, employers are generally responsible for their own employees"); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 168 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("In the standard drilling contract, [indemnity provisions] allocate costs and liability according to who hired the injured party, not who caused the accident.").

"When properly drafted, indemnity provisions used in the oil-and-gas industry provide for pass-through indemnity. Pass-through indemnity ensures that a claim made against an indemnitee passes through to the indemnitor, such as when an employer has agreed to provide indemnity for a claim by one of its employees." *RKI Expl. & Prod., LLC v. Ameriflow Energy Servs., LLC*, No. 02-20-00384-CV, 2022 WL 2252895, at *8 (Tex. App.—Fort Worth June 23, 2022, no pet.) (mem. op.).

> A pass-through occurs when the indemnitee to an agreement is presented with a third[-]party claim, which the indemnitee is then able to extend to the indemnitor. In other words, the third[-]party claim flows through the indemnitee, often the operator, to the indemnitor, often a contractor that owns the damaged property or employs the injured person.

*Id.* (quoting C. Randall King & G. Vincent Schuster, *Deconstructing the Indemnification Provision*, 2013 No. 3 Rocky Mtn. Min. L. Inst. Paper No. 3, at *3–8 (2013)).

One "method of obtaining pass-through protection is to expand the categories of persons or companies entitled to indemnity protection such that the indemnitor agrees to indemnify the indemnitee 'and its contractors and subcontractors (excluding Contractor and its subcontractors).'" *Nabors Drilling*, 2013 WL 3488152, at *5 n.5 (quoting William W. Pugh, *A Strategic Look at the Bigger Picture—Risk Allocation in Oil and Gas Operational Agreements*, 45 Rocky Mtn.

MIN. L. FOUND. J. 349, 354 (2008)). "The advantage of using this approach is that if the broad definition of Company Group is used consistently, from contract to contract, the company's [or operator's] flexibility will be maximized, and each contractor will receive the benefit of the other contractors' indemnities." John Almy & William W. Pugh III, *II. Overview of Risk Allocation in Operational Contracts*, State Bar of Tex., TXCLE Advanced Oil, Gas & Energy Res. Law Course 6-II, 2022 TXCLE-AOGERL 6-II (2022).

2. *TOAIA*

TOAIA was enacted in 1973 and was subsequently codified as Chapter 127 of the Civil Practice and Remedies Code. *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 348 (Tex. 2000); *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 802–03 (Tex. 1992); *see* CIV. PRAC. & REM. §§ 127.001–.007. Section 127.002 recites the legislature's public policy findings regarding the Act's application, including that "an inequity is fostered on certain contractors by the indemnity provisions in certain agreements pertaining to wells for oil, gas, or water or to mines for other minerals" and "[c]ertain agreements that provide for indemnification of a negligent indemnitee are against the public policy of this state." CIV. PRAC. & REM. § 127.002(a)–(b); *see Ken Petroleum*, 24 S.W.3d at 348. Prior to its enactment, contractors at well sites were forced to agree to and execute indemnity agreements with operators without a means to insure against such losses. *Getty Oil*, 845 S.W.2d at 803. Agreements of this nature placed disproportionate financial burdens on contractors who held inferior bargaining power to oil and gas operators. *Id.* TOAIA was enacted to remedy these circumstances: TOAIA voids and renders unenforceable any such indemnity agreement unless it meets certain specific requirements as set forth in the statute. *See* CIV. PRAC. & REM. §§ 127.003, .005.

In this regard, an agreement pertaining to a well for oil, gas, or water, or to a mine for a mineral is void and unenforceable under TOAIA if it purports to indemnify a person or entity against loss or liability for damage that is caused by or results from the sole or concurrent negligence of the indemnitee, his agent or employee, or an individual contractor who is directly responsible to the indemnitee, and that arises from personal injury or death, property damage, or any other associated loss, damage, or expense. *Id.* § 127.003. TOAIA contains certain exclusions from this general rule that are not relevant here. *See id.* § 127.004.

TOAIA also contains a safe harbor provision, which indemnity agreements must satisfy to be enforceable. *Id.* § 127.005. The safe harbor provision, entitled "Insurance Coverage," provides that TOAIA's bar against the enforceability of certain indemnity agreements does not apply if the parties (1) agree in writing, (2) that the indemnity obligation will be supported by liability insurance to be furnished by the indemnitor, (3) subject to certain limitations that are specific to "mutual" and "unilateral" indemnity obligations. *Id.* With respect to a "mutual indemnity obligation," such obligation is limited "to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to obtain for the benefit of the other party as indemnitee." *Id.* § 127.005(b). As for a "unilateral indemnity obligation," the amount of insurance that is required may not exceed $500,000. *Id.* § 127.005(c). "Mutual indemnity obligation" is defined as:

> [A]n agreement . . . in which the parties agree to indemnify each other and each other's contractors and their employees against loss, liability, or damages arising in connection with bodily injury, death, and damage to property of the respective employees, contractors or their employees, and invitees of each party arising out of or resulting from the performance of the agreement.

*Id.* § 127.001(3).

### 3. *Total is a Third-Party Beneficiary to the Lone Star MSA*

The first requirement of TOAIA's safe harbor provision is that a written agreement must exist between the parties. *See* CIV. PRAC. & REM. § 127.005(a). Total asserts that (1) a written agreement exists between Parsley and Lone Star that supports their mutual indemnity obligations with liability insurance coverage, and (2) the Lone Star MSA clearly expresses an intent that Lone Star will defend and indemnify the "Company Group," which includes Total as a Parsley contractor. We agree with Total on both points.

The first point is undisputed—the Lone Star MSA contains a mutual indemnity obligation in which both Lone Star and Parsley promise to obtain identical liability insurance coverage and amounts to support their indemnification obligations. The significance of the second point hinges on whether TOAIA permits a party, by virtue of common law third-party beneficiary principles, to enjoy the protection of the statute's safe harbor provision. Therefore, we must begin by examining the statute.

### i. *Statutory Construction*

Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent. *Belew*, 692 S.W.3d at 362 (citing *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). "We begin by examining the plain meaning of the statute's language." *Id.* (citing *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014)). "We derive legislative intent from the statute as a whole rather than from isolated portions of it." *Id.* (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). "That is, we read statutes contextually to give effect to every word, clause, and sentence because every word and phrase is presumed to have been used intentionally, with a meaning and a purpose." *Id.* (citing *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)).

10

"If the statute is clear and unambiguous, we must read the language according to its common meaning 'without resort to rules of construction or extrinsic aids.'" *Id.* (quoting *Crosstex Energy Servs.*, 430 S.W.3d at 389); *but see* TEX. GOV'T CODE ANN. § 311.023 (West 2013) (permitting the consideration of legislative history and other construction aids regardless of ambiguity).

Here, TOAIA is silent regarding the application of common law third-party beneficiary principles. *See* CIV. PRAC. & REM. §§ 127.001–.007. Moreover, as Total points out, the Texas Supreme Court has acknowledged in a similar context that "[t]he common law allows parties to contract for the benefit of others—in effect, *with* others—if they do so explicitly, and when they do, the beneficiary can enforce the promisor's obligation in his favor as if he were himself a party." *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007). Of course, statutes can modify common law rules, but before we construe a statute in that context, we must examine the legislature's intent and "consider at all times the old law, the evil, and the remedy." *Id.* (quoting GOV'T § 312.005).

*Energy Service Co. of Bowie* involved the interpretation of the Texas Workers' Compensation Act (TWCA), specifically whether Section 417.004 precluded a third-party beneficiary from enforcing a written agreement for the subscribing employer to indemnify it. *Id.* at 190–91; *see* TEX. LAB. CODE ANN. §417.004 (West 2015). The court concluded that nothing in the history of the TWCA suggested that the section at issue was intended to abrogate common-law third-party beneficiary principles. *Energy Serv. Co.*, 236 S.W.3d at 194–97. The same is true here.[4]

---

[4]The parties dispute *Energy Service Co.*'s relevance to this appeal. Because the conflict in that case arose in the context of MSAs between multiple contractors and an operator, the court acknowledged the inferior bargaining power from which oilfield contractors may suffer, but it declined to construe the text of Section 417.004 to restrict indemnification agreements to only the parties to the agreement itself. *Energy Serv. Co.*, 236 S.W.3d at 194–95. The court pointed out that, rather than inserting such restrictions into the

As we have said, TOAIA was enacted to address "an inequity [that] is fostered on certain contractors by the indemnity provisions in certain agreements" that pertain to oil and gas wells, among other things. CIV. PRAC. & REM. § 127.002(a). In 2000, the Texas Supreme Court summarized TOAIA's origins after its latest amendment:

> The legislative history indicates that in 1973, drilling and other contractors had agreed to indemnify operators but were unable to obtain insurance at a reasonable cost or in some cases to obtain any insurance at all to cover liability that might be incurred from the indemnity obligations. Contractors were thus subjected to significant liability with no feasible means of insuring against those obligations.

*Ken Petroleum*, 24 S.W.3d at 348 (applying the 1991 version of TOAIA but acknowledging it was amended in 1995 and 1999); *see Getty Oil*, 845 S.W.2d at 803 (explaining that prior to the enactment of TOAIA, oil companies and well operators leveraged their superior bargaining power to insert onerous indemnification provisions in agreements with oil and gas drilling and service contractors, which placed undue financial burdens on those contractors).

---

TWCA, the legislature enacted TOAIA to limit the liability that contractors may undertake through indemnification agreements. *Id.* at 195. Ultimately, although the respondent and the dissent argued that it is necessary to restrict mutual indemnity obligations to only the signatories to the agreement to protect them from the economic pressures associated with the oilfield industry, the court stated that TOAIA had been enacted to provide such protection to the extent the legislature determined that any should be provided. *Id.* at 196. The court favorably quoted the amicus curiae brief of the Texas Oil and Gas Association regarding the "significant policy and practical considerations favoring" the use of mutual indemnity agreements:

> [E]ach party in the oilfield takes care of its own "slice of the risk" (claims by its own employees against the other party and its contractors or subcontractors as third party beneficiaries). In return, the indemnitor and the indemnitor's contractors or subcontractors receive a reciprocal indemnity from the indemnitee as third party beneficiaries (for claims by the indemnitee's employees). This approach to risk allocation provides a level of certainty to all of the parties regarding liability exposure.

*Id.*

It is true, as Lone Star reminds us, that *Energy Service Co.* did not concern TOAIA and only mentioned it in dicta. At times, dicta can be a helpful guide. *See Tesoro Petroleum*, 106 S.W.3d at 131 (citing *Dresser Indus.*, 853 S.W.2d at 508). But for our purposes it is inconsequential because the text of the statute is clear.

Total argues that nothing in TOAIA suggests that it preempts the longstanding common law principles regarding third-party beneficiaries. Lone Star argues that this point is irrelevant. As we will explain in further detail, this point is indeed relevant as a threshold inquiry because Total asserted its claim for defense and indemnity as a third-party beneficiary to the Lone Star MSA. Thus, if it were determined that Total is not a third-party beneficiary—either because the parties did not intend for it to be or because TOAIA precludes it—we would not need to reach or address the question of whether any indemnity obligation between Total and Lone Star satisfies the "mutuality" requirement of TOAIA's safe harbor provision. *See* CIV. PRAC. & REM. §§ 127.001(3), .005(b); *Tesoro*, 106 S.W.3d at 130–31 ("We decline to hold that mutuality is destroyed by the failure to include meaningless indemnification provisions in a mutual indemnification obligation. The mutuality of the indemnity agreement is not destroyed by Nabors's giving Tesoro a release . . . without also agreeing to a meaningless indemnity for Tesoro against claims no one but Nabors could have.").

TOAIA contains seven sections—Section One lists definitions, Section Two describes the legislature's findings, Section Three provides the general bar on certain oilfield indemnity agreements, Section Four lists certain exclusions to the bar, Section Five provides the safe harbor provision requirements, Section Six specifies that TOAIA does not affect the validity of an insurance contract or a benefit conferred by the workers' compensation statute, and Section Seven provides that TOAIA does not deprive a surface estate owner from the right to secure indemnity. *See* CIV. PRAC. & REM. §§ 127.001–.007. Although nothing in TOAIA expressly addresses third-party beneficiaries, it specifically sets forth the "evil" that it remedies as well as the exemptions and exceptions to its general bar of indemnity agreements, which, like the ones in this case, fall within its purview. *See* CIV. PRAC. & REM. §§ 127.002–.005; GOV'T § 312.005.

13

Moreover, although Section 127.005(a) states that TOAIA's bar does not apply to an agreement that provides for indemnity if "*the parties* agree in writing" that the indemnity obligation will be supported by mutual, reciprocal liability insurance, we do not read this section to restrict the applicability of the safe harbor provision's protections to only those who are signatories to the agreement. CIV. PRAC. & REM. § 127.005(a) (emphasis added). Section 127.001(3) defines "[m]utual indemnity obligation," the subject of Section 127.005(b), as one "in which the parties agree to indemnify each other *and each other's contractors and their employees* against loss . . . arising in connection with bodily injury . . . of the respective employees, *contractors or their employees, and invitees* of each party." *Id.* § 127.001(3) (emphasis added).

Thus, TOAIA contemplates that non-signatories should be included within the scope of permissible oilfield indemnity schemes, a practice which Texas courts have repeatedly recognized to be routinely followed in the oil and gas industry. *See, e.g.*, *RKI Expl.*, 2022 WL 2252895, at *8 (quoting *Deepwater Horizon*, 470 S.W.3d at 456 n.5); *Nabors Drilling*, 2013 WL 3488152, at *5; *Chesapeake Operating*, 94 S.W.3d at 168; *see also Energy Serv. Co.*, 236 S.W.3d at 196.

TOAIA is strictly construed to permit parties to contract freely regarding agreements that are not covered by the statute. *Getty Oil*, 845 S.W.2d at 805; *see Energy Serv. Co.*, 236 S.W.3d at 194 & n.17 (acknowledging that a statute that deprives a person of a common law right will not be extended beyond its plain meaning or applied to cases not clearly within its purview). Because the legislature chose to bar only certain indemnification agreements and in turn included a wide variety of exceptions to that bar, we will not construe TOAIA to exclude the application of common law third-party-beneficiary principles where TOAIA does not express an intent to the contrary. *See Getty Oil*, 845 S.W.2d at 805; *see also* William E. Mahoney, *Making Sense of the Texas Oilfield Anti-Indemnity Act*

*(TOAIA): It's About Recovery*, 16 TEX. J. OIL, GAS, & ENERGY L. 95, 106 (2021) ("The language of the statute in Section 127.003 manifests that the law seeks to broadly void indemnification provisions in contracts related to wells or mines, but TOAIA's many exceptions turn out to be the rule.").

## ii. *Contractual Construction*

Indemnity agreements are construed under the rules of contract construction. *Nabors Drilling*, 2013 WL 3488152, at *3 (citing *Associated Indem. Corp. v. Cat Contracting, Inc.*, 964 S.W.2d 276, 284 (Tex. 1998)). When construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *Id.* (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)); *see Gaskins, Tr. of Van Martin Gaskins Fam. Tr. v. Navigator Oil & Minerals, Inc.*, 670 S.W.3d 391, 400 (Tex. App.—Eastland 2023, pet. denied) ("In other words, what controls is not the intent that the parties meant but failed to express; rather, it is the intent that the parties did, in fact, express." (citing *Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991))).

Generally, the benefits and burdens of a contract belong solely to the contracting parties, and "no person can sue upon a contract [unless] he [is] a party to or in privity with it." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (quoting *House v. Hous. Waterworks Co.*, 31 S.W. 179 (Tex. 1895)). There is a common law exception to this rule that "permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary." *See id.* (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Corp.*, 995 S.W.2d 647, 651 (Tex. 1999)).

It is well-settled that "[a]bsent a statutory or other legal rule to the contrary," a person's status as a third-party beneficiary is determined by the contracting parties' intent. *Id.* (citing *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (footnote omitted)). The person or entity seeking to establish third-party beneficiary status

must demonstrate that the contracting parties "intended to secure a benefit to that third party" and "entered into the contract directly for the third party's benefit." *Id.* (quoting *Stine*, 80 S.W.3d at 589). "It is not enough that the third party would benefit—whether directly or indirectly—from the parties' performance, or that the parties knew that the third party would benefit." *Id.* (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 421 (Tex. 2011)); *see also S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the United Methodist Church*, 716 S.W.3d 475, 489 (Tex. 2025).

The third party's expectation or intent that it should benefit is similarly irrelevant. *See Brumitt*, 519 S.W.3d at 102 (citing *Banker v. Breaux*, 128 S.W.2d 23, 24 (Tex. 1939)). "To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a 'claimant' in the event of a breach." *Id.* (quoting *Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975)). Consistent with general contract interpretation principles, we refer to the contract's language, construed as a whole, to determine whether the contracting parties intended for a third-party beneficiary to exist. *Id.* (citing *Southland Royalty Co. v. Pan. Am. Petroleum Corp.*, 378 S.W.2d 50, 53 (Tex. 1964)). The contract must contain "a clear and unequivocal expression" of this intent; any implied intent is insufficient. *Id.* at 103 (citing *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). We presume that the parties contracted solely for themselves and resolve any doubt about their intent against conferring third-party beneficiary status. *Id.*

The Lone Star MSA states that Lone Star will defend and indemnify the "Company Group," which includes Parsley's contractors. The MSA defines "Contractor" as Lone Star, but the terms "contractors" and "subcontractors" are not defined. Generally, to ascertain an undefined term's plain meaning, we first consult ordinary dictionary definitions, then consider the term's usage in other statutes, court decisions, and authorities. *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Texas Pol.*

16

*Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022); *Epps v. Fowler*, 351 S.W.3d 862, 865–66 (Tex. 2011) (collecting cases). Merriam-Webster defines "contractor" as "one that contracts or is a party to a contract" or "one that contracts to perform work or provide supplies." *Contractor*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Black's Law Dictionary similarly defines the term as "[a] party to a contract" or "one who contracts to do work for or supply goods to another; especially, a person or company that agrees to do work or provide goods for another company." *Contractor*, Black's Law Dictionary (12th ed. 2024).

Total is Parsley's "contractor" within these definitional meanings.[5] In fact, the parties agree that Total and Parsley executed an MSA by which Total would provide goods and services to Parsley, namely the assignment and placement of Ramirez to Parsley as the company man or contract well consultant for the Patterson Well. Therefore, Total is a Parsley contractor within the meaning of the "Company Group" as defined in the Lone Star MSA. Consequently, because TOAIA does not exempt third-party beneficiaries from TOAIA's protections, and because the language of the mutual indemnity obligation provision in the Lone Star MSA specifically confers the benefit of defense and indemnification to Parsley's contractors, it necessarily follows, and we conclude, that Total is a third-party

---

[5]Total does not address the legal status of Ramirez's relationship with Parsley; however, Lone Star asserts that he was Total's independent contractor. Total states that it "provided [Ramirez], an independent contractor, as the company man for the Patterson Well under a well consultant agreement." Ramirez may have been at least a contractor, subcontractor, or invitee of Parsley and thus covered in the Lone Star MSA by the same language. *See Subcontractor*, Black's Law Dictionary (12th ed. 2024) ("Somone who is awarded a portion of an existing contract by a contractor."); *Invitee*, Black's Law Dictionary (12th ed. 2024) ("Someone who has an express or implied invitation to enter or use another's premises, such as a business visitor or a member of the public to whom the premises are held open."). Whatever his precise status is or was, Ramirez is a joint party and aligned with Total, is represented by the same counsel, and made all filings jointly with Total, including the petition in intervention that claimed that both Total and Ramirez are third-party beneficiaries to the Lone Star MSA. The following analysis therefore applies equally to him.

beneficiary of the Lone Star MSA.  *See XTO Energy Inc. v. Frontier Drilling, LLC*, 549 F.Supp.3d 526, 534–38 (N.D. Tex. 2021) (finding that a Texas oilfield mutual indemnity agreement that expressly extended to an operator's contractors also extended to such contractors as third-party beneficiaries and complied with Section 127.005); *Basic Energy Servs. L.P. v. Exco Res., Inc.*, No. 05-15-00667-CV, 2018 WL 564157, at *2, *5 (Tex. App.—Dallas Jan. 26, 2018, pet. denied) (mem. op.) (holding, in a non-TOAIA case, that similar language meant the indemnitor was obliged to indemnify members of the MSA's "Company Group" as intended third-party beneficiaries).  However, our analysis does not end here.

4.  *Total's Claims Against Lone Star are Supported by Insurance*

Irrespective of Total's third-party-beneficiary status, Lone Star contends that such status is of no consequence because there is no mutual, reciprocal indemnity obligation between Lone Star and Total, and even if there were, any purported mutual indemnity obligation is not supported by sufficient, mutual, and equivalent insurance.[6]  We disagree.

Lone Star argues that the indemnification obligations between Total and Parsley in Section 13(a) of the Total MSA are more restrictive than the indemnification obligations between Lone Star and Parsley in the Lone Star MSA, and thus as a Parsley contractor Lone Star would not be entitled to indemnification from Total if such a claim arose.  Therefore, Lone Star reasons that mutuality between it and Total is undermined.  But no party in this case has sought relief—

---

[6]Lone Star asserts that *Energy Service Co.* demonstrates a typical arrangement of mutual indemnity obligations in oil and gas agreements.  *See Energy Serv. Co.*, 236 S.W.3d at 190–92, 195–96.  The court explained that although neither of the two contractors had a mutual indemnification agreement between themselves, and because neither was a party to the other's agreement with the operator, each was covered, as an operator's contractor, pursuant to the terms of the other's agreement with the operator.  *Id.* at 190–92. The court also explained that this practice was widespread in the oil and gas industry because ensuring that everyone who works on a wellsite has a signed agreement with each other may well be impractical, and that this approach to risk allocation provides a level of certainty to all the parties regarding liability exposure.  *Id.* at 195–96.

declaratory or otherwise—regarding the Total MSA, and the trial court's final judgment does not address it. Moreover, our analysis does not require that we consider the Total MSA; therefore, we decline to construe it. *See XTO Energy*, 549 F.Supp.3d at 538 ("[N]either Great Northern nor Frontier are parties or third-party beneficiaries to the Rusco-XTO MSA, and there are no claims or counterclaims seeking declaratory judgment of the Rusco-XTO MSA. . . . Therefore, the Court will not analyze the Rusco-XTO MSA.").

As a third-party beneficiary, Total is entitled to enforce the Lone Star MSA to receive the benefits the parties intended to confer upon it. *See Brumitt*, 519 S.W.3d at 102. TOAIA's "Insurance Coverage" provision, Section 127.005, provides a safe harbor within its governance for indemnity agreements that are supported by insurance coverage. CIV. PRAC. & REM. § 127.005. This section contemplates that such insurance-backed agreements may encompass and protect more entities than only the signatory parties, such as the parties' contractors. *See id.* §§ 127.001(3), .005(a)–(b). But these non-signatory parties benefit from their inclusion in the indemnity "group" *as entities that are covered by the signatory parties' liability insurance coverage. See id.*

When parties to an MSA agree to extend the indemnity-supporting insurance that they secured for those who are encompassed in each other's indemnified "[g]roup," such coverage may also extend to them as a third-party beneficiary. *See, e.g., XTO Energy*, 549 F.Supp.3d at 538. That is the circumstance before us. Here, Total's claim as a third-party beneficiary under the Lone Star MSA falls under the purview of Parsley's *and* Lone Star's liability insurance coverage. Total's claim is thus subject to Lone Star's insurance coverage because Lone Star agreed to include Parsley's "contractors"—which encompasses Total and Rameriz—as additional insureds in its policies of insurance. Likewise, for purposes of mutuality, because Total's claim is pursuant to its status as a member of the "Company Group" in the

19

Lone Star MSA, Lone Star's argument that there is an absence of mutuality between it and Total fails because Parsley mutually agreed to include Lone Star and the members of the "[Company or Contractor] Group" as additional insureds in its policies of insurance. Consequently, as a member of the "Company Group," Total is covered by the mutual, insurance-supported indemnity obligations in the Lone Star MSA and, as such, the rights to defense and indemnity provided by these policies of insurance inure to Total's benefit and may be enforced by it. *See XTO Energy*, 549 F.Supp.3d at 534–38, 540–43.

Although the controlling insurance policies are not included in the record, each MSA provided that the parties would structure their respective insurance coverage to include all members of their "group," specifically with respect to indemnity obligations. In this regard, we imply all findings that are necessary to support the trial court's judgment. *Shields*, 526 S.W.3d at 480; *Moncrief Oil*, 414 S.W.3d at 150. Neither party disputes that the policies of insurance obtained by Lone Star and Parsley satisfy these requirements. Nor do the parties dispute that the Lone Star MSA complies with Section 127.005 or that either Lone Star or Parsley failed to comply with the MSA's provisions. Instead, the focus of this appeal is whether Total may assert its claims against Lone Star as a third-party beneficiary to the Lone Star MSA.

As we have concluded, Total is a third-party beneficiary to the Lone Star MSA. We further conclude that because the claims asserted by Total against Lone Star are engrossed within and subsumed by the mutual, insurance-supported indemnity obligations between Lone Star and Parsley, and because Total is a member of the "Company Group" and an additional insured and thus may enjoy the benefit of this coverage, Total's claim for defense and indemnity as a third-party beneficiary under the mutual indemnity obligation in the Lone Star MSA falls within Section 127.005's safe harbor provisions. CIV. PRAC. & REM. § 127.005. Therefore,

20

Lone Star is contractually obligated to provide Total a defense and indemnity in the Salmons suit under that agreement. *See XTO Energy*, 549 F.Supp.3d at 538 (addressing similar circumstances); *see also* CIV. PRAC. & REM. §§ 127.003, .005. As such, the trial court did not err in so finding.

Accordingly, we overrule Lone Star's first issue.

B. *Attorney's Fees*

In its second issue, Lone Star contends that, if we resolve the issues it has raised on appeal in its favor, the trial court's attorney's fee award to Total should be vacated, or, alternatively, remanded to the trial court for reconsideration. Because we affirm the trial court's judgment on Lone Star's other substantive issues, we decline to reverse the attorney's fee award.

Accordingly, we overrule Lone Star's second issue.

C. *The Trial Court Should Determine the Indemnity Obligation's Scope*

In its third issue, Lone Star contends, in the alternative, that the trial court erred when it failed to determine and include in its final judgment the amount and limitation of the indemnity that Lone Star would be obligated to provide Total. Lone Star argues that the trial court should have (1) specified whether the indemnity obligation that it found to be applicable was either "unilateral" or "mutual" and (2) limited the obligation accordingly—to either the $500,000 statutory cap for unilateral obligations or, for a mutual obligation, to the lesser of the insurance limits that "each party as indemnitor has agreed to obtain for the benefit of the other party as indemnitee." *See* CIV. PRAC. & REM. § 127.005(b), (c); *Ken Petroleum*, 24 S.W.3d at 350.

Ultimately, Lone Star argues that even if we determine that the Lone Star MSA controls, as we have, the trial court's final judgment should be reformed to expressly limit the indemnity obligation to the $11 million in insurance coverage procured by Lone Star pursuant to the terms of the Lone Star MSA. In response,

21

Total concedes that it "would not object to the Court reforming the trial court's judgment to specify $11,000,000 as the limit to Lone Star's indemnity obligation to Total Energy in the event a judgment is rendered against Total Energy in the underlying personal injury lawsuit." In its reply brief, Lone Star avers that any indemnity it owes under the Lone Star MSA is also owed to multiple parties other than Total and Ramirez, and that there are or will be reductions from the amount of total insurance coverage that would be available because of other claims that have been, or will be, satisfied. Lone Star requests that, if we conclude that it owes an indemnity obligation to Total that exceeds the $500,000 "unilateral" cap, we should remand this issue to the trial court so that it may determine the specific indemnity amount that is owed and in turn revise its final judgment accordingly.

The indemnity obligation in the Lone Star MSA is a mutual obligation with limits that exceed the $500,000 "unilateral" cap. CIV. PRAC. & REM. § 127.001(3). Moreover, Total's petition in intervention specifically requested that the trial court declare "the amount of indemnity that the parties contractually agreed to provide." Because the trial court did not, we agree with Lone Star that the specific amount of indemnity that it owes to Total is a determination that the trial court should make.

Accordingly, we sustain Lone Star's third issue.

D. *The Indemnity Claim is Ripe*

In its fourth issue, Lone Star contends that any duty to indemnify is not ripe for adjudication while the Salmons lawsuit remains pending. Total responds that, to be ripe, its declaratory judgment action does not require the existence of a final judgment in the Salmons suit, and that it specified in its petition in intervention that it did not seek a declaration that indemnity must be paid contemporaneously with a favorable judgment. Total also states that it would "agree to the Court reforming the trial court's judgment" to recite that "Lone Star is obligated to defend and indemnify [Total] in the event judgment is rendered against Total" in the Salmons suit.

22

Although it is true that "a claim based on a contract that provides indemnification from liability does not accrue until the indemnitee's liability becomes fixed and certain," we agree with Total that it has not asserted a claim for indemnification but rather has sought a declaratory judgment claim. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 134 (Tex. 2010); *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 205 (Tex. 1999). Moreover, the Salmons lawsuit has been resolved and was disposed of by an agreed judgment and is no longer pending. *See supra* note 2. Consequently, notwithstanding the parties' arguments on this point, the indemnity dispute in this appeal is ripe for adjudication. *See, e.g.*, *Cucolo v. Cucolo*, No. 07-22-00218-CV, 2023 WL 2775173, at *3 (Tex. App.—Amarillo April 4, 2023, no pet.) (mem. op.).

Accordingly, we overrule Lone Star's fourth issue.

## IV. *This Court's Ruling*

We affirm in part, and we reverse and remand in part. Because the trial court did not determine or recite in its final judgment the amount of indemnity that Lone Star owes to Total, we reverse its judgment in part, and we remand this cause to it for the limited purpose of making this indemnity obligation determination. In all other respects, we affirm the judgment of the trial court. TEX. R. APP. P. 43.2(a), (d), 43.3.

W. STACY TROTTER

JUSTICE

February 12, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.